# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IRMA ROSAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-2778 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO; JANICE K. JACKSON; | ) | |
| STATE OF ILLINOIS; ILLINOIS STATE | ) | |
| BOARD OF EDUCATION; CARMEN I. | ) | |
| AYALA; MIGUEL CARDONA; MARTY | ) | |
| WALSH; CHICAGO TEACHERS UNION, | ) | |
| LOCAL 1, AMERICAN FEDERATION OF | ) | |
| TEACHERS, AFL-CIO; and JESSE | ) | |
| SHARKEY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In her governing Third Amended Complaint ("Complaint," [90]), Plaintiff brings suit against Defendants the Board of Education of the City of Chicago ("Board"); Janice Jackson ("Jackson"), in her official capacity as Chief Executive Officer of Chicago Public Schools; the State of Illinois ("State"); the Illinois State Board of Education ("ISBE"); Carmen Ayala ("Ayala"), in her official capacity as Illinois State Superintendent of Education; Miguel Cardona ("Cardona"), in his official capacity as Secretary of the United States Department of Education; Marty Walsh ("Walsh"), in his official capacity as Secretary of the United States Department of Labor; Chicago Teacher's Union, Local 1, American Federation of Teachers, AFL-CIO ("CTU"); and Jesse Sharkey ("Sharkey"), in his official capacity as President of CTU.[1] Currently before the Court are CTU and Sharkey's motion to dismiss [110]; the State and ISBE's motion to dismiss

---

[1] After Plaintiff filed her governing third amended complaint [90], Cardona replaced Elisabeth DeVos as Secretary of Education and Walsh replaced Eugene Scalia as Secretary of Labor.

[112]; the Board's motion to dismiss [113]; and Cardona and Walsh's motion to dismiss [115]. For the reasons explained below, CTU and Sharkey's motion to dismiss [110] is GRANTED; the State and ISBE's motion to dismiss [112] is GRANTED; the Board's motion to dismiss [113] is GRANTED IN PART AND DENIED IN PART; and Cardona and Walsh's motion to dismiss [115] is GRANTED. Plaintiff's claims against the Board for Title VI discrimination and retaliation (Counts IV and V) remain in the case. All other claims and parties are dismissed for the reasons explained below.

In view of the multiple prior attempts that Plaintiff has had to construct viable pleadings, if Plaintiff wishes to further amend her Complaint to add claims or parties or make any other changes to her pleading, she must file a motion for leave to file a Fourth Amended Complaint by June 18, 2021. Plaintiff must limit her motion to 15 pages as required by Local Rule 7.1, unless she receives prior approval of the Court. Plaintiff also must attach a copy of the proposed Fourth Amended Complaint to her motion. If Plaintiff chooses to seek leave to file a Fourth Amended Complaint, she is advised that a complaint need contain only "a short and plain statement of the claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although the Court does not penalize Plaintiff for the length of her current Complaint (699 paragraphs over 156 pages, plus over thirty pages of exhibits), it agrees with Defendants that Plaintiff's decision to include so much factual detail, in chronological order and without discussion of which facts are important to particular claims and defendants, makes it difficult to assess the sufficiency of Plaintiff's pleading. Plaintiff would assist the Court by focusing less on factual details and more on summarizing her theory of how and why each Defendant has violated the law. After reviewing any proposed amended complaint, the Court will determine whether to grant leave to amend or, alternatively, it may require Plaintiff to proceed on the remaining claims from the prior operative complaint if

leave to amend appears to be futile.  If Plaintiff chooses to stand on her existing complaint, a joint status report that includes a proposed discovery plan is due no later than June 25, 2021.

## I.    Background

The following facts are drawn from the Complaint [90].  All well-pled facts are presumed to be true for purposes of Defendants' motions to dismiss.  See *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021).  Plaintiff identifies as Chicana, a woman of Mexican origin or descent.  She began teaching for Chicago Public Schools ("CPS") as a Bilingual Teacher beginning in June 2018 at Mireles Elementary Academy ("Mireles").  She worked at Mireles during the 2018-2019 school year and at Calmeca Academy of Fine Arts & Dual Languages ("Calmeca") during the 2019-2020 school year.  According to the Complaint, Mireles and Calmeca "are designated Title I campuses as defined by the Elementary and Secondary Education Act of 1965" and receive federal funding.  See [90] at 5-6.

Defendant Board is "responsible for the governance, organizational and financial oversight" of CPS.  [90] at 5.  Defendant Jackson is CPS's Chief Executive Officer.  Defendant ISBE "is responsible for the educational policies and guidelines for public, charter, and private schools from pre-school through grade 12 for the State of Illinois."  *Id.* at 6.  Defendant Ayala is Superintendent of the ISBE.  Defendant CTU is the "sole and exclusive bargaining agent for teachers [and other categories of employees] employed by the BOE."  *Id.* at 8.  Defendant Sharkey is CTU's President.  Cardona is sued in his official capacity as Secretary of the U.S. Department of Education.  Defendant Walsh is sued in his official capacity as Secretary of the U.S. Department of Labor.

During the time period relevant to the Complaint, the Principal of Mireles was Evelyn Randle-Robbins ("Robbins") and the Assistant Principal was Stacy Gray ("Gray").  The other

kindergarten teacher at Mireles was Stella Alorsey ("Alorsey"). In late August 2018, prior to the start of the school year, Plaintiff visited Mireles to begin preparing her classroom. According to the Complaint, the ceiling in Plaintiff's classroom was water-damaged, made of asbestos, and "had black mold covered with white paint," and the room had "a foul smell." [90] at 14. Plaintiff told Gray that she wanted these problems fixed. Plaintiff also complained about finding rodent droppings in her classroom on several occasions.

On August 31, 2018, Plaintiff contacted the parents of her new kindergarten students to introduce herself and answer any questions about the first day of school. The parents were "not aware" that Plaintiff "was a Bilingual teacher and that instruction would be in Spanish." [90] at 162-63. One parent, who was Mexican but whose daughter spoke only English, "became infuriated." *Id*. at 163. Plaintiff suggested he go to campus the next day, a Saturday, to talk to school administrators. *Id*. According to the Complaint, when Robbins found out about Plaintiff's phone calls to parents, she tried calling and texting Plaintiff "to no avail" and "finally sent her an e-mail" asking why she called students when the class list was not yet finalized; why she used her personal cell phone; why she "didn't … explain to the parent that Bilingual teachers in the current transitional programs in Mireles Academy do not deliver instruction solely in the child's native language all day long"; and why she told one parent she could show up at school on the weekend to speak with Robbins. [90] at 15. After Plaintiff made her phone calls, "[m]any parents or legal guardians" of students who spoke only English "requested their children be transferred to Alorsey's Kindergarten classroom." *Id*. However, many other monolingual English-speaking children remained in her classroom. See *id*. at 15-16.

On September 16, 2018, Plaintiff sent an email that she refers to as the "Complaint of CPS" to a number of city, state, and federal officials, including Jackson, the Secretary of Education and

Secretary of Labor. See [90] at 11; see also *id*. at 160-67. In the email, Plaintiff "highlighted concerns with the Bilingual and Special Education Programs and the physical working environment at Mireles" (asbestos, mold, etc.) and how Principal Robbins "had begun harassing her." *Id.* at 11. Plaintiff's primary problem with the school curriculum was that she was hired as a bilingual teacher but was expected by Robbins and Gray to act like a "general teacher." *Id.* at 164. Plaintiff complained that "Mireles has hundreds of Spanish Bilingual students but none of them are instructed in their native language." *Id*. Instead, a "transitional bilingual," or "TBE" model was used, *id*., in which students were instructed primarily in English. Plaintiff also noted that the school had no books or workbooks in Spanish or for English as a Second Language ("ESL") and "no environmental print in Spanish in hallways." *Id*. at 165. Plaintiff's classroom also lacked reading, writing, science, and social studies books. *Id*. Robbins' alleged harassment of Plaintiff included (but was not limited to) refusing to accept her application for the Local School Council ("LSC") when she first provided it; refusing to allow her to take her students on bathroom breaks in the manner she saw fit; telling her she was making "excuses" when she had no working computer to finish her lesson plans by the time they were due; and not providing her with a printer in her classrooms, like all the other teachers. See *id*. at 163-63. Other than an acknowledgment on behalf of then-Secretary of Education DeVos and an email from Ernesto Matias, Chief, Office of Language and Cultural Education (who is not a party to this suit), Plaintiff received no response. See *id*. at 13.

Plaintiff alleges that Robbins "continued to harass her in retaliation" for filing the Complaint of CPS. [90] at 13. On October 24, 2018, Plaintiff contacted her union field representative, Joseph McDermott ("McDermott") for the first time to file a grievance. See [90] at 35. On October 25, she "sent McDermott an e-mail that explained how the Bilingual Program

at Mireles violated Article 3-1 of the Contract." *Id*. at 36. On October 26, 2018, Plaintiff "filed an OSHA complaint online with the Department of Labor" against CPS and Mireles. *Id*.

Subsequently, Robbins observed Plaintiff in her classroom on several occasions without providing feedback. Plaintiff believes Robbins was recording her, without her permission, which Robbins denied. See [90] at 61. On November 20, 2018, Robbins called Plaintiff to her office and gave her a "Pre-Meeting Notice" for "failure to perform duties," allegedly for failing to submit "student learning tasks" by November 8. *Id.* at 43. Later the same day, Robbins sent Plaintiff and others an email stating that "[t]he continued reports that you've made [regarding rodent feces] have been inconsistent with our findings." *Id*. On November 26, 2018, following the Thanksgiving holiday, Robbins called Rosas into her office and handed her a second "Pre-Meeting Notice" for "failure to perform duties," allegedly for failing to submit all end-of-quarter assessments for reading and math.

On November 30, 2018, Rosas met with Robbins, McDermott, and Anna Szuber ("Szuber"), English Language Program Manager for Chicago Public Schools, to discuss the Pre-Meeting Notices. According to Rosas, "Szuber stated that bilingual students receiving ninety (90) minutes of native language instruction 'satisfie[d] the minimum requirement' by the State of Illinois; yet, she did not provide a copy of any statute to substantiate her allegation." [90] at 46. After the meeting, McDermott allegedly told Plaintiff, "I don't think your grievance is appealable. They're doing the bare minimum required by the State." *Id*.

On December 3, 2018, Robbins summoned Rosas to her office and gave her Performance Improvement Process ("PIP") paperwork for the two Pre-Meeting Notices issued in November. On December 4, 2018, Rosas met with Bilingual Coordinator Maggie Harper ("Harper") about Plaintiff's "difficulty teaching an entire lesson of Eureka Math/Engage NY per day." [90] at 48.

Harper allegedly refused her request to "complete one lesson over two days" and told her "You need to make it happen." *Id.* According to Plaintiff, Robbins and Gray did not hold her fellow kindergarten teacher, Alorsey (who is from Ghana), to the same expectations. See *id*. at 49. Over the next two days, Plaintiff emailed Harper, Robbins, and Gray to explain how she tried to follow their instructions but found it impossible to complete the allotted tasks in the given time. See *id*. at 49-50. Shortly after she sent her email, on December 6, Robbins and two other school employees "stormed into Ms. Rosas' classroom in such a way that reminded her of when federal authorities retrieved Elion Gonzalez from his relatives' home in Florida in 2001." *Id.* at 50. Plaintiff's "Kindergarteners stared at the three with panic-stricken faces." *Id*. Robbins allegedly said, "I'm taking over from here." *Id*. Robbins also allegedly told Plaintiff, "we're having a meeting on Monday. Do you plan on being absent on Monday?"

On December 10, at Robbins' request, Plaintiff attended a "meeting with parents to address 'concerns regarding instruction and the classroom environment in room 120.'" [90] at 51. Plaintiff audio recorded the meeting. Robbins repeatedly referred to Plaintiff as "this teacher," rather than "Ms. Rosas," which Plaintiff found offensive and objected to during the meeting. *Id*. Concerns raised by parents included how much instruction their students were receiving in Spanish; "where it says that it is by law" that 60 minutes per day of instruction be provided in Spanish; and the students' grades, which were prepared by a substitute due to Plaintiff being out ill. According to Plaintiff, "Robbins blamed her—in front of parents and staff—for a lack of instruction in Spanish and the classroom environment in room 120." *Id.* at 53.

Plaintiff was out periodically in December 2018 to January 2019, working a few days and then taking off sick for a few days. On the morning of January 15, 2019, Plaintiff "began feeling ill again." [90] at 59. She informed the school clerk (but not Robbins or Gray, who were not in

the office) that she was leaving at 1:15. The clerk said she would inform them. Later that day, Robbins sent Plaintiff an email telling her that leaving work without emailing or speaking to her was "negligent/incompetent as you had little regard for the supervision of your kindergarten students for the remainder of the day." *Id*. at 59-60. On January 16, 2019, Robbins called Plaintiff to her office again and gave her two Pre-Meeting Notices.

On February 3, 2019, Robbins emailed Rosas and asked to meet with her upon her return to work the next day, after being out sick January 28, 29, and February 1. Robbins wanted to meet "regarding a new assignment" and "to finalize your formal observation/post-conference." [90] at 61. The same night, Rosas "finalized applying for Short Term Disability with CPS," and informed Robbins and Gray of this. *Id.* at 62. On February 4, Plaintiff emailed Robbins and Gray to say she was "out sick" for the week. *Id.* That morning, as Plaintiff waited to take the train to her doctor, "Robbins' last e-mail repeatedly played in her head" and "the only way to stop it was to jump-off the platform." *Id.* Plaintiff decided to go to the emergency room and "received intensive outpatient therapy" for the next six weeks. *Id.* Plaintiff's "Disability was extended several times" and "opening e-mail from Robbins and mail from CPS became extremely difficult." *Id.* at 63.

At some point, Plaintiff became able to return to work. On May 23, 2019, Robbins emailed Plaintiff to inform her that she would be teaching a "self-contained 6th grade classroom" to cover for another teacher who was out on a medical leave of absence. [90] at 64-65. "Seeing her Kindergarten students in the halls with other already overcrowded classes was too much for Ms. Rosas to endure psychologically" so she did not report to work the next day. From May 25 to May 29, 2019, Plaintiff taught the sixth-grade class. She had difficulty maintaining discipline, which Plaintiff attributes to the students having substitute teachers. On May 29, Robbins visited Plaintiff's classroom and "interrogated" Plaintiff in front of her students. *Id.* at 67. Plaintiff

allegedly responded to Robbins, "this is the situation *I walked into*. I tell them to lower their volume, I tell them to get off the chairs, I tell them to take out their math books but they say they don't have books—that they lost them or that they're at home—and to take out a piece of paper but they won't." *Id.* Plaintiff alleges that "Robbins intentionally placed her in the situation when *she* returned from medical leave." *Id.*

Plaintiff did not report to work May 30. Instead, she "personally went to the U.S. Department of Labor at the Klucynski Federal Building to file *another* complaint against Chicago Public Schools: Mireles Elementary Academy." [90] at 68. The same day, Plaintiff also filed a complaint against CPS with the Illinois Department of Labor. Plaintiff did not report to work May 31, either. That morning, Jackson was served with Plaintiff's original complaint in this lawsuit. See *id*. That afternoon, Robbins called her twice and emailed her asking for a response, but Plaintiff "could not bring herself to contact Robbins." *Id*.

On June 2, Plaintiff received an email from "Workforce Planning" informing her that she had "not been renewed as a teacher for the 2019-20 school year." [90] at 69. The email also stated that "we have sent a certified mailing to you with information to assist you in determining your next steps regarding insurance and re-employment." *Id*. On June 4, Robbins gave her a letter, signed by Jackson, which stated that the reason for the nonrenewal was that Plaintiff was "not on track to achieve proficiency as a teach by the end of this school year." *Id.* at 72. Plaintiff contends that this did not comply with her contract, which allegedly (1) required that she be provided with all available components of her summative rating within 7 days of the last day of student attendance; and (2) required written notice of non-renewal to be provided by May 10. See *id*. On June 7, Plaintiff filed a third grievance with CTU.

Although Plaintiff's employment at Mireles was not renewed, she was hired at another CPS school for the following school year. In early August 2019, Sylvia Orozco-Garcia ("Orozco"), the interim principal of Calmeca, hired Plaintiff for the 4th Grade Bilingual Teacher position. [90] at 81. Plaintiff had twenty-seven students. Six of the students had individualized education plans ("IEPs") and two had "504 Plans"; however, Plaintiff "received no additional classroom support for them." *Id.* at 83. Calmeca had no self-contained Special Education classes. Plaintiff's "students struggled with writing; almost all did not have a firm understanding of sentence structure, much less paragraphs and essays." *Id.* at 88. The students also "struggled with math; almost a quarter still did not know how to add and almost half still did not know how to subtract." *Id.* According to the Complaint, all of Plaintiff's students had received inflated grades from their previous teachers, so their parents questioned the accuracy of the grades Plaintiff gave them.

On October 16, 2019, the school music teacher, Miguel Cervantes ("Cervantes"), informed Plaintiff that one of her students had been called a "lesbian" during Cervantes' class, and the student was upset about it. [90] at 94. Plaintiff, who identifies as a "member of the LGBTQ community," alleges that she pulled the student aside and "privately told her that the issue would be addressed" after the impending teacher's strike was over. *Id.* On November 1, 2019, Plaintiff "addressed the issue" with the two involved students. See *id.*

Plaintiff had disciplinary problems with one of her students, who she refers to as "CS2." On December 3, 2019, the student's father approached her at the end of the school day to ask if Plaintiff had CS2's ruler, which Plaintiff had taken away earlier that day when he was misbehaving with it. Plaintiff alleges that the parent was "offensive and threatening." [90] at 105. On December 4, 2019, Plaintiff sent an email to Orozco requesting that CS2 be removed from her

class because his behavior impeded other students' learning and was negatively affecting her health.  See *id*. at 105-106.

About ten minutes after Plaintiff sent her email, she received an email from Sonia Cisneros, Administrative Assistant, Office of Inspector General, informing Plaintiff that it had "received allegations against you involving inappropriate conduct with a student(s)."  [90] at 106.  The letter stated that an investigation would be conducted and that Plaintiff should call if she had not heard the outcome within sixty days.  Plaintiff "called her mother in tears."  *Id*.

On December 5, 2019, CS2 was transferred out of Plaintiff's class to another fourth-grade teacher.  Another student, CS4, was transferred into Plaintiff's class.  Plaintiff contacted CS4's "home school" that day and was allegedly informed that CS4 was being transferred because he was "very low," wet his pants, and his mother would not take him for a psychological examination. [90] at 107.

Plaintiff "could not bring herself to return to work after the winter break," because the allegations against her concerning inappropriate conduct with a student "triggered memories of sexual abuse from her childhood."  [90] at 116.  On January 8, 2020, she "returned to the Partial Hospitalization Program."  *Id*. at 119.  She requested a medical leave of absence from CPS.  See *id.* at 120.  Annette Rizzo, CTU Health and Benefits Coordinator, informed Plaintiff that she was not eligible for short term disability coverage because she had last used it within the previous year. See *Id.* at 121.  Rizzo told her that the only thing she may be eligible for was "discretionary leave," but that "offers no job security."  *Id*.  On January 31, 2020, Plaintiff was approved for discretionary leave from January 2 to March 1, 2020.  CPS informed Plaintiff that she would not have "any position protection with this absence."  *Id.* at 122.  CPS explained: "Because you are not eligible for FMLA, your current absence is not job protected.  When you are medically cleared and ready

to return to work, if the position is open and an offer has not been extended to another candidate, you may return to the position you held prior to your leave." *Id*. Plaintiff alleges that the Board applied the wrong policy and that if the right policy had been applied, her job would have been protected.

On March 3, 2020, Plaintiff called "CPS Leave of Absence," spoke with "Alberta," and asked when her leave was over. See [90] at 127. Alberta told Plaintiff that it had been approved through March 1 and that she could extend it, but not indefinitely. Plaintiff decided to see her doctor that day before making decisions concerning her leave; Alberta therefore stated that she was not going to make any changes regarding Plaintiff's leave and that Plaintiff could call once she knew when she expected to be able to return to work. See *id.* at 128. Plaintiff saw her doctor, who released her back to work on March 10, 2020. *Id*. Plaintiff emailed Principal Orozco to tell her. Early in the morning on March 9, Orozco responded and told Plaintiff to check with HR about the date of her return and advised her not to return until HR cleared her. Later that morning, Orozco emailed Plaintiff: "I am not sure if you were informed that as of right now your position at Calmeca is no longer available. Please contact the HR and Leave departments so they can provide guidance." *Id*. at 130. According to Plaintiff, her position was, in fact, still available, and she applied for it. See *id.* at 130-31. Plaintiff called HR and allegedly was told that although she did not have a position with the school anymore, she still had insurance for up to 25 months. See *id*. at 130.

This was around the beginning of the global COVID-19 pandemic in the United States. On March 15, 2020, Plaintiff applied for unemployment. [90] at 132. On March 24, Plaintiff spoke with "Ms. Wallace" in HR Plaintiff said she was an active employee and believed she should be being paid even though she had been released from Calmeca. *Id*. On March 30, HR emailed

Plaintiff to inform her that the "Temporary Bilingual Teacher (4-5)" position had been filled. [90] at 133.

On April 4, Rizzo emailed all CTU members: "[a]t the beginning of the COVID-19 school closures, you were issued new guidelines for healthcare leaves based on new and temporary rules due to the COVID-19 virus. From March 17 through April 10, the school closings are being viewed as an Act of God. During this time, you are paid through the Public Health Emergency (PHE) fund. For paid FMLA and STD, no benefits will be exhausted from March l7-April 10. You will receive regular pay if on an approved, paid Family and Medical Leave Act (FMLA) and Short Term Disability (STD) Ieave. *Anyone on unpaid leave will remain unpaid*." [90] at 134. Plaintiff did not receive a paycheck on April 10. See *id.* Plaintiff complained to her union representative, John Kugler, who did nothing. On April 24, she emailed Sharkey, CTU's President.

On April 28, CPS Customer Service employee Jamal Cummings sent Plaintiff an email informing her that he had confirmed with HR and payroll that she was on a discretionary leave from 1/2/20 to 3/1/20, which went into unpaid status on 1/16/20. Cummings further wrote that "[a]s of April 21st, no return to work paperwork has been received" and "[b]ecause of these details, you were not eligible to receive any pay" for the March 16-March 27 pay period. [90] at 138-39. Kerry Frank, Manager of Employee Leaves CPS, told her essentially the same thing in an April 29 email. See *id*. Frank's email referred to an attached "separation letter," which read: "[y]our approved discretionary leave has ended as of 3/2/20. Because you did not request a leave extension, your employment is being separated as of the date of this letter. Your health insurance will end as of 5/1/20. Should you be able to return to work in the future, you are welcome to apply for positions that are open at that time and for which you are qualified." *Id.* at 139.

Plaintiff spoke with Frank again May 6 and recorded the conversation. He said the problem was that Plaintiff did not contact CPS stating what she wanted to do after her leave ended March 1. Plaintiff said this was untrue and that she had communicated with his office and her doctor's office submitted all the necessary paperwork for her to return to work. She maintained that there was an open position on March 10 when she was cleared to return to work, which was not filled until March 30, according to CPS's "Taleo website." [90] at 144. Frank told her that the position was not available. *Id*.

Based on these allegations, Plaintiff brings a ten-count Complaint against Defendants. Each count is summarized below in the analysis section. Currently before the Court are Defendants' motions to dismiss the Complaint for failure to state a claim. See [110], [112], [113], [115]; see also [122], [123] (Plaintiff's responses); [130], [132], [134], [136] (Defendants' replies).

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that, to state a claim for relief, a complaint "must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." "The questions under [this rule] are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020). Although "a complaint need not identify legal theories," it "nonetheless must allege some facts that support whatever theory the plaintiff asserts" in response to a motion to dismiss. *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013) (affirming dismissal of complaint for failure to state a claim where plaintiff alleged that he "may assert a hostile work environment claim even though he did not assert such a claim in his complaint," because "[n]othing in [his] amended complaint … fairly suggests a hostile work environment"). That is, "a plausible claim must include 'factual

content' sufficient to allow the court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Charleston v. Board of Trustees of University of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). However, this "tenet … is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, which "can [be] reject[ed] at the motion to dismiss stage." *Dix v. Edleman Financial Services, LLC*, 978 F.3d 507, 514 (7th Cir. 2020).

The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The Court may also consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621 (7th 2020). In opposing a Rule 12(b)(6) motion, a plaintiff is "free to 'elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

### III.    Analysis

#### A.    Counts I and II, Claims Against the Federal Defendants

In Count I of the Complaint, Plaintiff sues Cardona is his official capacity as Secretary of the U.S. Department of Education.  The Complaint alleges that on September 16, 2018, Plaintiff sent DeVos (Cardona's predecessor) and other public officials an email that "highlighted concerns with the Bilingual and Special Education Programs and the physical working environment at Mireles, and how [Robbins] had begun harassing her."  [90] at 11.  The next day, Plaintiff received an acknowledgement, which stated in part that Plaintiff's complaint "ha[d] been forwarded to the appropriate staff member for review and further handling."  *Id.* at 12-13.  Neither DeVos nor anyone from her office contacted Plaintiff to discuss her complaint.  *Id.*  Plaintiff alleges that DeVos "stood by without intervening to prevent the violation of Ms. Rosas' constitutional rights, even though she had the opportunity to do so," and as a result Plaintiff "suffered intentional discrimination, retaliation, and disparate treatment."  *Id.* at 150.

In Count II, Plaintiff brings suit against Walsh in his official capacity as Secretary of the United States Department of Labor.  See [90] at 7.  Plaintiff alleges that the Secretary of Labor "stood by without intervening to prevent the violation of [Plaintiff's] constitutional rights, even though he had the opportunity to do so."  *Id.* at 150-51.  As a result of the Secretary's "failure to intervene to prevent the violation of [Plaintiff's] constitutional rights," the Complaint alleges, Plaintiff "suffered intentional discrimination, retaliation, and disparate treatment."  *Id.* at 151.

Cardona and Walsh move to dismiss the claims against them on several bases, including that they are barred by the Eleventh Amendment.  See [115] at 2-3.  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  As Defendants correctly note, see [115] at 3—and Plaintiff does not dispute—

"the United States has not waived its immunity as to so-called 'constitutional torts'" like those asserted in Counts I and II. *Amen Ra ex rel. v. IRS*, 2016 WL 7188162, at *3 (N.D. Ill. Dec. 12, 2016) (quoting *Meyer*, 510 U.S. at 486). Thus, the Court grants the federal Defendants' motion to dismiss Counts I and II.

Plaintiff seeks leave to amend her Complaint to maintain claims against Cardona and Walsh in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff further seeks leave to add at least five more federal employees as defendants for failing to provide an adequate (or any) response to her OSHA and other complaints. The Court denies Plaintiff leave to amend in the manner proposed, because Plaintiff has not stated a *Bivens* claim.

In 1871, Congress passed a statute, later codified at 42 U.S.C. § 1983, which authorizes suits for money damages against state officials for violating an individual's constitutional rights. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (U.S. 2017). However, "Congress did not create an analogous statute for federal officials." *Id.* In *Bivens*, the Supreme Court "held that, even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated" the Fourth Amendment's "prohibition against unreasonable search and seizures." *Ziglar*, 137 S. Ct. at 1854. Subsequently, the Court extended *Bivens* to two other contexts: Fifth Amendment gender discrimination suits by congressional employees who are not covered by Title VII, see *Davis v. Passman*, 442 U.S. 228, 247-48 (1979), *Ashcroft v. Iqbal*, 556 U.S. 662, 675–77 (2009), and Eighth Amendment claims for the failure to provide adequate medical care. See *Carlson v. Green*, 446 U.S. 14 (1980); see also *Oden v. True*, 2020 WL 4049922, at *2–3 (S.D. Ill. July 20, 2020). "In the limited settings where *Bivens* … appl[ies], the

implied cause of action is the federal analog to suits brought against state officials under [Section] 1983." *Iqbal*, 556 U.S. at 675.

In more recent decades, the Court has declared the "expansion of *Bivens* … 'a disfavored judicial activity,'" and "gone so far as to observe that if 'the Court's three *Bivens* cases [had] been ... decided today,' it is doubtful that [it] would have reached the same result." *Hernandez v. Mesa*, 140 S. Ct. 735, 742-43 (U.S. 2020) (quoting *Ziglar*, 137 S. Ct. at 1857). "When asked to extend *Bivens*, we engage in a two-step inquiry": "We first inquire whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.'" *Id*. at 743. A context is "new" if it is "different in a meaningful way from previous *Bivens* cases decided by th[e] Court." *Id*. "When we find that a claim arises in a new context, we proceed to the second step and ask whether there are any 'special factors [that] counsel[l] hesitation' about granting the extension." *Id*. "If there are—that is, if we have reason to pause before applying *Bivens* in a new context or to a new class of defendants—we reject the request." *Id*.

The Court finds it unnecessary to go through an extensive analysis here, because Plaintiff's proposed claims against the existing and proposed new federal defendants do not fall within any of the recognized categories of *Bivens* actions. The allegations in the Complaint and the additional allegations in Plaintiff's response brief do not implicate Fourth Amendment searches and seizures, Fifth Amendment gender discrimination, or Eighth Amendment failure to provide adequate medical care. Further, these allegations do not appear to implicate any other constitutional rights. Plaintiff does not identify any and none are apparent to the Court. Even if there were an arguable constitutional basis to support a *Bivens* action against any federal defendants, there is ample "reason to pause" before extending the *Bivens* remedy to the context here. In particular, authorizing suit under the facts alleged here would open the floodgates to innumerable lawsuits

for damages against federal officials or other employees who do not respond to a letter, complaint, or inquiry in the manner that the plaintiff deems appropriate. Extending *Bivens* in this manner would also be contrary to the general principal that "individual government officials 'cannot be held liable' in a *Bivens* suit 'unless they themselves acted [unconstitutionally].'" *Wood v. Moss*, 572 U.S. 744, 763 (2014) (quoting *Iqbal*, 556 U.S. at 683). That is, "*Bivens* is not designed to hold officers responsible for acts of their subordinates." *Ziglar*, 137 S. Ct. at 1860. Here, Plaintiff's complaint against the proposed federal defendants is that they did not step in to remedy the problems at the schools where she worked, not that they engaged in any unconstitutional conduct of their own. See *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) ("For constitutional violations under § 1983 or *Bivens,* a government official is only liable for his or her own misconduct." (internal quotation marks and citation omitted)).

Finally, Plaintiff seeks leave to amend to bring claims against the proposed federal defendants under the Federal Tort Claims Act, 28 U.S.C. § 2674. "The Federal Tort Claims Act 'is a limited waiver of the United States' sovereign immunity.'" *Knights v. United States*, 203 F. Supp. 3d 916, 927 (N.D. Ill. 2016) (quoting *Luna v. United States*, 454 F.3d 631, 634 (7th Cir. 2006)). "It renders the federal government liable for those acts or omissions of its employees that would be unintentional torts in the state in which they occurred had they been committed by someone other than a federal employee." *Id*. It "does not *create* liability." *In Matter of Complaint of Ingram Barge Co.*, 194 F. Supp. 3d 766, 786 (N.D. Ill. 2016). An action under the Federal Tort Claims Act is governed by the law of the place where the act or omission occurred—here, Illinois. See *Knights*, 203 F. Supp. 3d at 927. Plaintiff has not identified, and the Court is not aware of, any state tort that the proposed federal defendants might plausibly have violated based on the

conduct alleged here—essentially, failing to respond to Plaintiff's complaints about her place of employment.

**B.      Count III, Section 1983 "Failure to Intervene" Claims Against Jackson, Sharkey, and Ayala**

Plaintiff brings suit against Jackson, Ayala, and Sharkey in their official capacities pursuant to 42 U.S.C. § 1983 for "failure to intervene."  Plaintiff alleges that these three Defendants "stood by without intervening to prevent the violation of [her] constitutional rights, even though they had the opportunity to do so," and as a result Plaintiff "suffered intentional discrimination, retaliation, and disparate treatment."  [90] at 151.

In an official-capacity action, "a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978)). "A municipality is a 'person' under § 1983 and may be held liable for its own violations of the federal Constitution and laws." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Monell*, 436 U.S. at 690-91).  A plaintiff may also "bring a *Monell*-style claim against a private corporation acting under color of state law." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1035 (7th Cir. 2019); see also *Thomas v. Wexford Health Services, Inc*., 414 F. Supp. 3d 1154, 1161 (N.D. Ill. 2019).  *Monell* "recognizes three primary ways in which one might prove that the corporation or municipality itself inflicted the harm": (1) "the plaintiff may show that the alleged unconstitutional conduct implements or executes an official policy adopted by the entity's officers"; (2) "the plaintiff may show that the unconstitutional action was done pursuant to a custom—even one that is not formally codified"; or (3) "the plaintiff may prove that an actor with final decision-making authority within the entity

adopted the relevant policy or custom." *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021); see also *Pindak v. Dart*, 125 F. Supp. 3d 720, 745 (N.D. Ill. 2015).

### 1.      Jackson and Ayala

Jackson, who is sued in her official capacity as CEO of Chicago Public Schools, moves to dismiss Plaintiff's "failure to intervene" claim on the basis that the facts alleged do not plausibly support a *Monell* claim.   In particular, Jackson argues that Plaintiff has not pled factual content sufficient to support a reasonable inference that the Board has an express policy that causes discrimination, that there is a wide-spread practice of creating a discriminatory work environment, or that a person with final decision policymaking authority violated her constitutional rights.   See [113] at 7.

In response, Plaintiff identifies a wide variety of "policies" and "practices" that allegedly resulted in the deprivation of her constitutional rights—including teaching practices such as TBE, TPI, and "dual language model," withholding services to families, making them pay for field trips, disrespecting parents, hiring teachers who are not well-qualified, failing to provide teachers with books, manipulating student attendance records and grades, and failing to address problems with old buildings.   What is lacking, however, is an explanation of how any particular policy or practice proximately caused—or was the moving force behind—the violation of Plaintiff's constitutional rights.   See *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012) ("To establish municipal liability, a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights."); *Castro v. Dart*, 483 F.Supp.3d 564, 573–74 (N.D. Ill. 2020) ("To satisfy *Monell*, Plaintiffs must also allege facts that plausibly suggest the deprivation was *caused* by (1) an express municipal

policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority." (emphasis added)).

Plaintiff's Section 1983 claim against Ayala is deficient for the same reason. However, Ayala is not currently a party to this action. Plaintiff named Ayala as a defendant in the First Amended Complaint, but then removed her as a defendant from the Third Amended Complaint, terminating her from the case. See [51]. While Plaintiff renamed Ayala as a defendant in the Third Amended Complaint, Plaintiff never re-served Ayala and therefore Ayala has not been brought back into the case as a defendant.

### 2. Sharkey

Sharkey moves to dismiss Count III on the basis that he, as a private individual, had no obligation to address unconstitutional actions of the other Defendants, who are state actors. Section 1983 "provides a cause of action for the deprivation of constitutional rights by persons acting under color of state law." *Torres v. Madrid*, 141 S. Ct. 989, 994 (U.S. 2021). "Anyone whose conduct is 'fairly attributable to the State' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). "Private action may be deemed governmental when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights, where the state compels the act or controls the private actor, or when the state delegates a public function to a private entity." *Pindak*, 125 F. Supp. 3d at 745 (collecting cases); see also *Alarm Detection Systems, Inc. v. Village of Schaumburg*, 930 F.3d 812, 825 (7th Cir. 2019) (describing "conspiracy theory" of section 1983 liability for private actors). The facts alleged in the Complaint do not plausibly suggest any theory under which Sharkey could be held liable under § 1983. CTU is not a state agency and Sharkey is not a state official or employee. Further, the Complaint does not allege that Sharkey acted in concert with other Defendants who are state actors,

or that he took any particular action to deprive Plaintiff of her constitutional rights. The Complaint instead relies on legal conclusions, like that Plaintiff "received no assistance from the CTU, the exclusive bargaining representative for teachers, because the CTU colludes with the Board." [122] at 56. This is insufficient to state a claim.

"To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (quoting *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998)) (internal quotation marks omitted); see also *L.P. v. Marian Catholic High School*, 852 F.3d 690, 696 (7th Cir. 2017). The Seventh Circuit has cautioned that "[m]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Spiegel*, 916 F.3d at 616. Instead, "[s]uch allegations must 'be supported by some factual allegations suggesting such a meeting of the minds.'" *Holderman v. Walker*, 2021 WL 1192441, at *13 (N.D. Ill. Mar. 30, 2021) (quoting *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980)). The Complaint does not contain allegations suggesting that Sharkey and any state officials had a meeting of the minds to deprive Plaintiff of any constitutional rights. Count III against Sharkey is therefore dismissed.

### C. **Counts IV through X**, **Title VI Claims**

Counts IV through X of the Complaint purport to be for violations of Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance." 42 U.S.C. § 2000d. Title VI operates by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 286 (1998). To bring a private action under Title VI, "'the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program.'" *Allen v. City of Chicago*, 828 F. Supp. 543, 565 (N.D. Ill. 1993) (quoting *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980)).

42 U.S.C. § 2000d-3 provides that Title VI may not be construed "to authorize action ... by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment." "The provision was enacted out of 'concern that the receipt of any form of financial assistance might render an employer subject to the commands of Title VI rather than Title VII.'" *Outley v. City of Chicago*, 407 F. Supp. 3d 752, 766–67 (N.D. Ill. 2019) (quoting *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 627 n.6 (1987)). The Seventh Circuit has interpreted this provision to limit employment discrimination claims under Title VI to cases in which "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahren v. Bd. of Ed. Of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998); see also *Simpson*, 629 F.2d at 1235 n.16; *Outley*, 407 F. Supp. 3d at 766-67; *Afogho v. Illinois Central School Dist.*, 421 F. Supp. 3d 585, 593 (S.D. Ill. 2019).

1.    **CTU**

Plaintiff's Title VI claims against CTU must be dismissed because the Complaint does not plausibly allege that CTU is the beneficiary of Federal financial assistance. Nor does Plaintiff

allege that CTU is her employer, such that its discrimination against her might plausibly affect the beneficiaries of federal assistance (her students). Perhaps recognizing these defects, Plaintiff states in response that she "voluntarily withdraws" Counts IV through X against CTU. See [122] at 68.

However, Plaintiff seeks to amend the Complaint to bring a § 1983 *Monell* claim against CTU for violations of the First and Fourteenth Amendments. See [122] at 67-68. Plaintiff alleges that "CTU's conduct would have been different *but for* her racial/ethnic, cultural, and political Chicana identity to continually voice opposition to racial discrimination." *Id*. Plaintiff also seeks leave to amend to add § 1983 claims against McDermott, Sanchez, Rizzo, Kugler, and Echevarria in their individual capacities, in essence for failing to properly handle her grievances or respond to her communications. See *id*. at 66-67.

To prevail on a § 1983 claim against an individual, a plaintiff must provide that (1) she "was deprived of a right secured by the Constitution or laws of the United States," and (2) "the deprivation was visited upon h[er] by a person or persons acting under color of state law." *Id*. (quoting *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)) (internal quotation marks omitted). "Anyone whose conduct is 'fairly attributable to the State' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). "At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 823 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1972)). As noted above, "[p]rivate action may be deemed governmental" when (1) "private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights"; (2) "the state compels the act or controls the private actor; or "(3) the state delegates a public function to a private entity." *Pindak*, 125 F. Supp. 3d at 745

(internal citations omitted); see also *Alarm Detection Systems, Inc.*, 930 F.3d at 825. A plaintiff may also "bring a *Monell*-style claim against a private corporation acting under color of state law." *Gabb*, 945 F.3d at 1035; *Thomas*, 414 F. Supp. 3d at 1161.

Plaintiff has not demonstrated that she should be allowed to amend to bring a § 1983 claim against CTU or any of its employees, because neither the Complaint nor Plaintiff's response to the motions to dismiss allege any facts to support a plausible claim that the CTU or its employees were acting "under color of state law" when they engaged in the action (or inaction) alleged in the Complaint. The Complaint does not suggest that CTU has been "delegate[d] a public function" or that the State controls CTU. *Pindak*, 125 F. Supp. 3d at 745. Nor does the Complaint allege facts indicating that CTU—or any of its employees or officers—conspired or jointly engaged with any state actors to deprive Plaintiff of constitutional rights.

As noted above, "[n]either 'a bare allegation of conspiracy,' nor 'mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her [,] ... [is] ... enough to survive a motion to dismiss for failure to state a claim.'" *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 552–53 (N.D. Ill. 2011) (quoting *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir. 2009)). Instead, "[s]uch allegations must 'be supported by some factual allegations suggesting such a meeting of the minds.'" *Holderman*, 2021 WL 1192441, at *13 (quoting *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980)); see also *Ibarra*, 816 F. Supp. 2d at 552–53 (to state § 1983 conspiracy claim, plaintiff must allege "the parties, the general purpose, and the approximate date of the conspiracy" and the "nature of the alleged conspiratorial agreement").

Plaintiff does not allege facts suggesting an understanding or meeting of the minds to deprive her of the right to equal protection or any other constitutional rights. See [122] at 62-63. Rather, the Complaint indicates that Plaintiff complained to CTU and CTU did not respond to her

complaints or responded in a manner Plaintiff thought was incorrect or inadequate. See *id.* at 63-64. Plaintiff argues in her response brief that the CTU Defendants acted in concert with the Board by: (1) colluding with the Board to misinterpret Illinois law; (2) colluding with the Board to prolong the grievance procedures; (3) colluding with the Board to misinterpret "federal financial assistance"; (4) "play[ing] semantic games" over leave of absence policies; and (5) colluding with the Board "behind the scenes" over interpretation or application of a term in the collective bargaining agreement. See [122] at 58-61.

Assuming all of these allegations are either contained in the 699-paragraph Complaint or consistent with it, see *Peterson*, 986 F.3d at 753 n.2, they do not plausibly suggest a meeting of the minds between the CTU and the Board to deprive Plaintiff of the equal protection of the laws because she is Chicana. Plaintiff does not provide any facts describing the "nature of the alleged conspiratorial agreement" between the CTU and the Board. Her presumption that the CTU took certain acts in "collusion" with the Board appears to be based on "mere suspicion" that CTU must be conspiring with the Board since some of the CTU's decisions were adverse to Plaintiff's interests, which is not enough to survive a motion to dismiss. *Ibarra*, 816 F. Supp. 2d at 552-53; see also, e.g., *Hanania v. Loren-Maltese*, 212 F.3d 353, 357-58 (7th Cir. 2000) (plaintiff's allegation that attorney "railroaded [her] by getting her to sign [a] settlement agreement [with town] and later negotiated vacation pay on her behalf when by that time he was representing the town that had just fired her" might support legal malpractice claim, but did not show that attorney "conspired with the [town] defendants to deprive [her] of her constitutional rights"); *Williams v. City of Chicago*, 315 F.Supp.3d 1060, 1075-76 (N.D. Ill. 2018) (dismissing § 1983 conspiracy claim brought by arrestee who was tried and acquitted of murder against two police officers who investigated shooting and prosecutor who indicted him where nothing in the complaint suggested

that defendants had any agreement to deprive arrestee of his constitutional rights, and general allegations, such as that defendants decided to falsely implicate arrestee for an array of violent, criminal charges, were nothing more than labels and conclusions without supporting factual allegations).

### 2.  The Board

#### a.  Counts IV and V, Discrimination and Retaliation

In Count IV of the Complaint, Plaintiff alleges that the Board intentionally discriminated against her on the basis of her national origin, Chicana, in violation of 42 U.S.C. § 2000d and the Equal Protection Clause of the United States Constitution.  See [90] at 152.  Count V alleges that the Board retaliated against her for engaging in protected activity.  *Id.*

The Board moves to dismiss on basis that Plaintiff is not the primary beneficiary of federal financial assistance and the primary objectives of the Board's federally funded programs are not to provide employment.  [113] at 10.  However, employment discrimination claims may also be pursued under Title VI in cases where "discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid."  *Ahren*, 133 F.3d at 978. According to the Board, "[t]here are no allegations in the Complaint specifically alleging discrimination in her employment caused discrimination against students."  [134] at 8.  But the Complaint's allegations, viewed as a whole, are consistent with Plaintiff's argument (made in response to the motion to dismiss) that the Board's treatment of her denied students access to a "fair, equal, and significant opportunity to obtain a high-quality education, and to close educational achievement gaps."  [122] at 29.   Plaintiff alleges that she complained about CPS's bilingual program because it harms native Spanish-speaking students who do not receive sufficient instruction in Spanish (among other problems).   As a result, Robbins allegedly continued

harassing her, took her kindergarten class away, caused her to suffer a nervous breakdown, and did not renew her employment for the following year.

Alternatively, the Board moves to dismiss Counts IV and V for failure to state a claim. The parties presume, and the Court will as well, that Plaintiff's Title VI discrimination and retaliation claims "share an analytical framework" with and should be analyzed in a similar manner to Title VII claims. *Marcial v. Rush Univ. Med. Ctr.*, 2019 WL 3943667, at *6 (N.D. Ill. Aug. 21, 2019); see also [113] at 10-11; see also *Sawyer v. Columbia College*, 864 F. Supp. 2d 709, 720 (N.D. Ill. 2012) (comparing Title VI and Title VII). Although "[h]istorically, courts have turned to the *McDonnell-Douglas* framework" for evaluating employment discrimination claims, more recently the Seventh Circuit has emphasized that "the legal standard for employment cases 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse emp loyment action.'" *Marcial*, 2019 WL 3943667, at *6 (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

The Board asserts that, "Under the indirect or *McDonell-Douglas* method" of proving discrimination or retaliation "Plaintiff must show (1) she is a member of a protected class (2) she was meeting the Board's performance expectations (3) she suffered an adverse action; and (4) she was treated less favorably than similarly situated individuals not of her class." [113] at 11. The Board argues that the Complaint is deficient because "Plaintiff does not allege facts indicating any job-related actions taken against her were due to her Mexican origin or race," *id*.; the alleged facts and the reasonable inferences from those facts show Plaintiff was not meeting the Board's legitimate employment expectations, *id.* at 12; Plaintiff does not specify any alleged comparator, *id*.; and Plaintiff's non-renewal in June 2019 and termination in April 2020 were too remote from

the September 2018 "Complaint of CPS." (The Board concedes that Plaintiff's filing of her "Complaint of CPS" qualifies as protected activity for purposes of the retaliation claim, at least at the pleading stage.)

However, the detail that the Board claims is lacking from the Complaint is not required by governing precedent. The Supreme Court "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002); see also *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013) ("the Supreme Court has made clear that the pleading standards in Title VII cases are different from the evidentiary burden a plaintiff must subsequently meet when using the method of indirect proof under *McDonnell Douglas*"). "[I]n order to prevent dismissal under Rule 12(b)(6), a complaint alleging sex discrimination" (or discrimination based in another protected class) "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex" (or other protected class). *Luevano*, 722 F.3d at 1028 (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)) (internal quotation marks omitted). "To plead a retaliation claim under Title VII, a plaintiff must allege that she engaged in statutorily protected activity and was subjected to adverse employment action as a result of that activity, though she need not use those terms, of course." *Id.* at 1029.

Here, Plaintiff alleges that the Board took various adverse actions against her, up to and including non-renewal of her position at Mireles and falsely telling her that her position at Calmeca was no longer available, because of (1) her Chicana heritage; and (2) in retaliation for (among other things) filing the Complaint of CPS concerning Robinson's alleged harassment of her, CPS's method of teaching bilingual education, and unsafe classroom conditions. Plaintiff also pleads at

least some factual detail suggesting that Robbins and other school employees were hostile to her because of her Chicana heritage and advocacy for native Spanish-speaking students of Mexican heritage. According to Plaintiff, as a bilingual teacher with many students who were native Spanish speakers, she should have been spending a significant portion of the class day teaching in Spanish. But the school curriculum did not allow this, which she claims harmed students trying to learn English and gain further proficiency in Spanish. The schools also allegedly failed to provide Plaintiff with appropriate books and materials in Spanish and refused to provide her with equipment such as paper and a printer. Plaintiff also claims to have received pushback for prominently displaying the Mexican flag and figures of Mexican heritage in and outside her classroom. When Plaintiff complained, she was harassed and "non-renewed" at the end of the school year. Plaintiff's allegations are sufficient to state Title VI claims for discrimination and retaliation.

The extensive facts alleged in the Complaint suggest other potential motivation for the Board's and its employees' actions, such as that Plaintiff was not meeting the Board's expectations due to her frequent absences and failure to meet deadlines. Plaintiff might have been better off provide *less* detail in the Complaint. But the Court's job at this stage is not to weigh competing inferences. The Court must accept all well-pled facts and true and draw all reasonable inferences in Plaintiff's favor. See *Calderon-Ramirez*, 877 F.3d at 275. To survive a Rule 12(b)(6) motion, "the complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense," which the Complaint in this case does, albeit with much extraneous material to sift through. *Luevano*, 722 F.3d at 1028; see also, e.g., *Tamayo*, 526 F.3d at 1085 (plaintiff sufficiently pled violation of Title VII where she alleged salary discrepancy and

that "she ha[d] been subjected to adverse employment actions by Defendants on account of her gender").

> b.      **Counts VI, VII, and VIII, Allegedly Unconstitutional State Statutes**

In Count VI, Plaintiff alleges that 105 ILCS 5/34-84, which concerns the appointment and promotion of teachers and amount of time it takes to become a tenured teacher, violates equal protection. Counts VII and VIII concern provisions of the Unemployment Insurance Act: 820 ILCS 405/612, which makes academic personnel ineligible for unemployment between academic years, under certain circumstances; and 820 ILCS 405/604, which makes individuals ineligible for benefits during certain work stoppages for labor disputes.

The Court will dismiss these claims, without prejudice. In response to the motions to dismiss, Plaintiff asks to amend to remove any reference to the Board Defendants in Counts VI, VII and VIII. See [122] at 28, ¶ 81.   Plaintiff also "voluntarily withdraws Counts IV and X … as it relates to CTU Defendants."   *Id*. at 68, ¶ 42.   Plaintiff has not pled a viable claim against the State or a State official, either.   Counts VI, VII, and VIII do not state claims for violation of Title VI, because the statutes they challenge do not make any classifications based on race or national origin, or otherwise result in discrimination against Plaintiff because she is Chicana.   Instead, the statutory categorizations that Plaintiff claims violate equal protection are based on length of service, see 105 ILCS 5/34-84, and eligibility for unemployment between academic years, 820 ILCS 405/612, or during a labor dispute, 820 ILCS 405/604.

Further, "[t]he Eleventh Amendment bars most claims in federal court against a state that does not consent to the suit." *Carmody v. Board of Trustees of University of Illinois*, 893 F.3d 397, 403 (7th Cir. 2018). "A plaintiff can avoid this bar … by naming a state official who has 'some connection with the enforcement' of an allegedly unconstitutional state statute for the

purpose of enjoining that enforcement." *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)).  However, the Complaint as it currently stands does not request declaratory or injunctive relief generally or as a remedy for the State's allegedly unconstitutional statutes.

Conceivably, Plaintiff could bring a complaint for declaratory and injunctive relief against the proper state official.  For the statutes concerning unemployment, the proper state official appears to be the Director of the Department of Employment Security.  See 820 ILCS 405/201; 820 ILCS 405/1700 ("It shall be the duty of the Director to administer this Act.").  It is not entirely clear who the proper defendant would be in an action challenging 105 ILCS 5/34-84.  The State says school principals, not the ISBE, administer it.  But school principals are not state officials.  The are simply applying state law as written.  Absent the State identifying a more appropriate state official to name in his or her official capacity, Ayala in her official capacity as ISBE Superintendent seems like a plausible choice.  If Plaintiff wants to try to put together a proper claim for injunctive relief against the appropriate state officials, she is free to file a motion for leave to file a Fourth Amended Complaint.  Defendants may object and the Court can resolve the details of their arguments and the plausibility of any asserted claim at that time.

### D.    Count IX, Payments from Federal Public Health Emergency Fund

Count IX alleges that the Board discriminated against her in violation of 42 U.S.C. § 2000d and the Equal Protection Clause by "fail[ing] to pay her from the *federal* Public Health Emergency Fund between March 17 – April 10," unlike employees on FMLA and short-term leave, even though she was still an active employee at that point.  [90] at 150.  The Court will dismiss this claim because it has no conceivable connection to discrimination based on race or national origin and therefore provides no basis for bringing a Title VI claim.

### E.     Count X

Count X is brought pursuant to 42 U.S.C. § 2000d and is premised on an alleged Sixth Amendment violation.    According to the Complaint, the Board's investigation of alleged allegations of sexual misconduct was unauthorized and she was prevented from knowing any details of the allegations, which have been pending since December 4, 2019.   "As someone who has clean criminal records both in Illinois and Texas, loves children, was a victim of childhood sexual abuse herself, these false allegations have been psychological torture for" Plaintiff.   [90] at 156.   The State and CTU allegedly "have done nothing to curtail [the Board's] conduct."   *Id.* Plaintiff explains in her response to the motion to dismiss that Count X is based on "her Sixth Amendment right to 'enjoy the right to a speedy … and to be informed on the nature and cause of the [criminal] accusation."   [122] at 52.

Count X will be dismissed because it does not plausibly suggest that Plaintiff's Sixth Amendment rights have been violated.   The Sixth Amendment to the U.S. Constitution provides: "In all *criminal prosecutions*, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."   The constitutional right to a speedy trial is triggered when an indictment is returned against a defendant."   *United States v. Hills*, 618 F.3d 619, 629 (7th Cir. 2010); see also *United States v. Kashamu*, 15 F. Supp. 3d 854, 860 (N.D. Ill. 2014).   There is no suggestion from the Complaint that Plaintiff is being criminally prosecuted or that an indictment has been or ever will be returned against her.   The Sixth Amendment is therefore inapplicable.   So too is its "guarantee that a

defendant be informed of the nature of the charges against him"—which is one of the "minimum requirements for an indictment," *United States v. Troutman*, 572 F. Supp. 2d 955, 960-61 (N.D. Ill. 2008), rather than a freestanding right that applies any time an employer is investigating an employee for alleged misconduct.

## IV.     Conclusion

For these reasons, CTU and Sharkey's motion to dismiss [110] is GRANTED; the State and ISBE's motion to dismiss [112] is GRANTED; the Board's motion to dismiss [113] is GRANTED IN PART AND DENIED IN PART; and Cardona and Walsh's motion to dismiss [115] is GRANTED. Plaintiff's claims against the Board for Title VI discrimination and retaliation (Counts IV and V) remain in the case. All other claims and parties are dismissed. Plaintiff is given leave to file motion for leave to file a Fourth Amended Complaint by June 18, 2021 if she wishes to do so. Plaintiff must limit her motion to 15 pages as required by Local Rule 7.1, unless she receives prior approval of the Court. Plaintiff also must attach a copy of any proposed Fourth Amended Complaint to her motion. After reviewing any proposed amended complaint, the Court will determine whether to grant leave to amend or, alternatively, it may require Plaintiff to proceed on the remaining claims from the prior operative complaint if leave to amend appears to be futile. If Plaintiff chooses to stand on her existing complaint, a joint status report that includes a proposed discovery plan is due no later than June 25, 2021.

Dated: May 17, 2020

Robert M. Dow, Jr.
United States District Judge