# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IRMA ROSAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-2778 |
| v. | ) | |
| | ) | Judge April M. Perry |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO, and CHICAGO TEACHERS | ) | |
| UNION LOCAL 1, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Irma Rosas ("Plaintiff"), a Hispanic school teacher formerly employed by the Chicago

Public Schools ("CPS"), brings this discrimination and retaliation case against the Board of

Education of the City of Chicago ("Board"), and her former union, the Chicago Teachers Union

Local 1 ("CTU"). Specifically, Plaintiff claims that the Board discriminated against her based

upon her race, national origin, and disability and then retaliated against her, and that CTU

discriminated against her by mishandling or otherwise failing to properly pursue her grievances

against the Board. This order resolves a motion for summary judgment submitted by CTU. For

the reasons set forth below, the Court grants CTU's motion.

## FACTS AT SUMMARY JUDGMENT

The Court uses Plaintiff's and CTU's Local Rule 56.1 statements to recount the facts,

which are undisputed except where noted. The Court views the facts in the light most favorable

to Plaintiff, "giving her the benefit of conflicts in the evidence and reasonable inferences from

the evidence, but without vouching for the objective truth of any fact or expressing any opinion

on the weight of the evidence." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924–25 (7th Cir. 2020).

From June 2018 until March 2020, Plaintiff taught at two CPS elementary schools: Mireles and Calmeca. Doc. 282 ¶ 1. As a teacher, Plaintiff enjoyed the benefits of collective bargaining agreements ("CBAs")[1] between CTU and the Board. *Id.* ¶ 2. Under these CBAs, disputes between the Board and union members were to be resolved through specific grievance and arbitration procedures. *Id.* One of CTU's responsibilities was to represent employees in this process by filing and arbitrating grievances against the Board on their behalf. Not all filed grievances proceeded to arbitration: rather, CTU periodically reviewed grievances it had filed and decided which ones were worth pursuing further in arbitration. *Id.* ¶ 11. Plaintiff's claim arises from her perception that CTU discriminated against her by mishandling four grievances she asked CTU to submit on her behalf, as detailed below.

In June 2018, Plaintiff began working as a teacher at Mireles. *Id.* ¶ 3. Early in the school year, Plaintiff asked CTU to file a grievance regarding her belief that the Board had violated its bilingual education policies at Mireles. *Id.* ¶ 5. In November 2018, CTU did file a grievance with the Board on Plaintiff's behalf, asserting that the Board had violated its own policies by, among other things, failing to provide Plaintiff with a teaching mentor, requiring Plaintiff to teach primarily in English, and not providing certain other learning resources to Plaintiff. *Id.* ¶ 5; Doc. 261 at 1024. Plaintiff also requested that CTU file a grievance regarding maintenance and cleanliness issues. In February 2019, CTU filed the requested grievance, asserting to the Board that Plaintiff had ongoing maintenance concerns and health hazards in her classroom, including

---

[1] In 2019, one collective bargaining agreement between Defendant and the Board expired and a successor agreement was negotiated and executed. Doc. 282 ¶ 2.

air quality problems from mold, rat droppings, and falling pieces of wet ceiling tiles. *See* Doc. 282 ¶ 6; Doc. 261 at 1027–28. Ultimately, CTU decided not to arbitrate either of these two grievances and informed Plaintiff of its decision on August 13, 2019. Doc. 282 ¶¶ 11–12. CTU asserts this was due to its view that neither grievance was likely to prevail in arbitration, *see id.* ¶ 13, though Plaintiff disputes this explanation.

Plaintiff had been hired on a probationary basis and was not renewed after her first year of teaching at Mireles based on the Board's evaluation of her performance. *Id.* ¶¶ 3–4, 7; *see also* Doc. 261 at 1030. Plaintiff's third grievance pertained to her non-renewal. On June 4, 2019, Plaintiff was informed by the Board that it would not renew her for another term based on its conclusion that she was "not on track to achieve proficiency as a teacher by the end of this school year." Doc. 282 ¶ 7. After this, Plaintiff spoke with CTU regarding her non-renewal concerns and she submitted a formal grievance authorization on June 7, 2019. *Id.* ¶ 8; *see also* Doc. 261 at 1036. CTU did not immediately file a grievance because the Board had not yet finalized its teacher performance ratings for the 2018–2019 school year, and both the Board and CTU agreed that it would be premature to file grievances over performance-based terminations before ratings were finalized.[2] Doc. 282 ¶ 9. On June 10, 2019, CTU's representative Joseph McDermott emailed Plaintiff a checklist with the instruction that she should "use it to determine if you have a grievance related to evaluation … Once you receive your full summative rating, you can send it to me along with the grievance authorization." Doc. 261 at 1035. Plaintiff did not complete the checklist or contact McDermott after her summative rating issued. Doc. 282 ¶ 10.

---

[2] Defendant explains that the Board informs teachers of performance-based layoff decisions based on projected ratings, which is why Plaintiff learned of her non-renewal before ratings were finalized. Doc. 282 ¶ 9.

That said, Plaintiff notes that the Board failed to follow its procedural requirements for evaluating teacher performance, and so she should have received a default performance rating of "proficient" rather than the "not on track" rating she actually received. Doc. 289 ¶¶ 3–4. CTU never filed a grievance over Plaintiff's non-renewal at Mireles. Doc. 282 ¶ 10.

Following her exit from Mireles, Plaintiff found work under a probationary contract at Calmeca. Doc. 282 ¶¶ 15–16. Early in the school year, allegations were made that Plaintiff had engaged in unwanted physical contact with students, leading to an investigation.[3] *Id*. ¶ 17. These allegations distressed Plaintiff, who did not return to school after winter break and instead took day-to-day sick leave and requested a leave of absence. *Id*. ¶¶ 18–19. On January 31, 2020, the Board approved Plaintiff's leave request for the period of January 2, 2020 until March 1, 2020. *Id*. ¶ 19. Plaintiff's status during this period was "discretionary leave," meaning her right to return to her position was not guaranteed and the position could be filled by the Board if it found another teacher. *Id*. On March 10, 2020, Plaintiff asked to return to work but someone else had filled her position. *Id*. ¶ 20.

On April 24, 2020, Plaintiff complained to CTU about the misconduct investigation against her and her inability to return to work at Calmeca after taking leave. *Id*. ¶ 22; *see also* Doc. 261 at 1119. On May 13, 2020, Plaintiff filed her fourth request for a grievance regarding numerous issues, including her denied request to return to work at Calmeca and that she was placed on a form of leave that did not protect her right to return to work. Doc. 282 ¶ 21. CTU did not file this grievance either. *Id*.

---

[3] Plaintiff denies that any student made these accusations, but rather asserts that "[t]he allegations were by parents of students and consisted entirely of hearsay." Doc. 282 ¶ 17. For purposes of this summary judgment motion, however, the Court understands the basic premise that someone made allegations against Plaintiff is not disputed.

**LEGAL STANDARD**

Summary judgment is proper when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmovant then must come forward with specific facts showing there is a genuine issue for trial. *See LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in her favor, this obligation does not extend to drawing inferences that are supported by only speculation or conjecture. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

**ANALYSIS**

Plaintiff's only claim against CTU is that it violated Title VII by failing to appropriately pursue her four grievances against the Board. Doc. 166 at 9–10. A union violates Title VII when it discriminates among its members on the basis of race or national origin when performing union functions. *See Maalik v. Int'l Union of Elevator Constr., Local 2*, 437 F.3d 650, 652 (7th Cir. 2006). These functions include handling employee requests to file grievances and representing those employees through the relevant grievance and arbitration procedures. *Id.*; *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 284 (1976) (potential Title VII

5

liability for union alleged to have favored one race but not the other with respect to grievance procedures).

At summary judgment, Title VII plaintiffs may organize their evidence of discrimination into the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or instead present evidence "in a holistic fashion." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023). Under the *McDonnell Douglas* framework, a plaintiff has "the initial burden to establish a *prima facie* case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022). But no specific approach to marshalling evidence is required so long as a reasonable factfinder could take the evidence as a whole and "conclude that it added up to … discrimination." *Wince*, 66 F.4th at 1041; *see also Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (plaintiffs need not follow *McDonnell Douglas* framework to prove discrimination, but do need to show that the relevant evidence could support a finding of injury "*because of*" a protected characteristic).

Plaintiff's evidence of discrimination falls into two categories: facts relating to CTU's practices separate from Plaintiff—specifically, how it organizes grievance records and how it pursued certain grievances not involving Plaintiff—and the facts surrounding Plaintiff's own experiences. The Court starts with the former.

Plaintiff appears to assert that a reasonable factfinder could infer CTU's discriminatory animus from the way it organizes its grievance records. Specifically, she accuses CTU of not categorizing its records in a way that allows quick identification of instances where union

6

members complained about instruction of Spanish-speaking students. Doc. 289 at 1–2.[4]
Accordingly, CTU's recordkeeping system has frustrated Plaintiff's efforts to prove
discrimination under the *McDonnell Douglas* framework, insofar as she has had difficulty
identifying similarly situated, non-Hispanic teachers who received more favorable treatment with
respect to the processing of grievances. *See* Doc. 283 at 2. In support of her argument, Plaintiff
notes that CTU has "had decades to conform … its record creation and management policies
with the *McDonnell Douglas* framework" and that it would "certainly be easy enough for CTU
to categorize grievances and requests or grievances … by race, language, [or] the underlying
issues … yet it has chosen to do otherwise." *Id*. at 3–4.

     The Court is not persuaded by Plaintiff's speculation. Plaintiff cites no law, policy, or
recognized best practice imposing on unions an affirmative duty to manage grievance records in
the way Plaintiff proposes, from which the Court could infer that CTU's failure to comply
evidences discriminatory intent. Her assertion that it would be easy for CTU to categorize its
grievance records differently is also unsupported, but even if it were, that fact would not support
the reasonable inference that CTU's choice of recordkeeping system (which Plaintiff does not
describe in any detail) is motivated by anything worse than bureaucratic inertia. Simply put: no
reasonable inference can be drawn that CTU's failure to organize its grievances in an easily-
searchable system is evidence of discrimination. It may explain why Plaintiff has not pointed to a

---

[4] In an interrogatory, Plaintiff asked CTU to identify, for the period of 2018 until 2021, all grievances or
complaints received or filed by members regarding the instruction of Spanish speaking students, and to
identify details including who made the complaint, the complaint's date, and ultimate resolution. Doc.
289 at 1–2. CTU answered that between 2018 and 2021, it filed 1,721 grievances for employees working
for the Board of Education for the City of Chicago, but that grievances were "not organized in a way that
permits an automated search for the subject matter of instruction of Spanish-speaking students" and
objected that "a manual search for responsive grievances would be unduly burdensome." *Id*. It does not
appear that Plaintiff ever filed a motion to compel production of all of the grievances, which would have
allowed Plaintiff to search for evidence she believed to be relevant.

similarly-situated individual who was not a member of her protected class being treated more favorably, but Plaintiff's lack of evidence of discrimination is not itself evidence of discrimination.

The next category of evidence arises from comments made by Plaintiff at her deposition. Specifically, Plaintiff expressed her belief that there were specific instances that CTU had handled grievances submitted by non-Hispanic teachers with greater care and gravity than CTU handled her own grievances. *See* Doc. 282 ¶¶ 35–38, 40–41. At her deposition, Plaintiff shared her belief that this anecdotal evidence supported the inference that CTU discriminated against her. Doc. 261 at 101–03.

The Court notes that Plaintiff does not refer to any of these anecdotes in her brief opposing summary judgment and does not submit any independent facts or context about these comparator grievances. For its part, CTU supplies a more detailed account of each grievance referenced by Plaintiff at her deposition, and reasons why they are not comparable to Plaintiff's circumstances. See Doc. 282 ¶¶ 35–38, 40–41; Doc. 261 at 182–83 (paragraphs 26–29). Plaintiff was entitled to challenge CTU's explanation of these other grievances with her own facts and evidence, but declined to do so. On the current record, then, there is no way for a factfinder to meaningfully compare Plaintiff's circumstances to similarly situated others, nor reasonably infer that unlawful discrimination explains the differences in process or outcome.

The Court turns to the facts surrounding Plaintiff's own experiences. The parties organize their arguments around Plaintiff's four grievances (or attempted grievances), and so the Court's analysis will also proceed on a grievance-by-grievance basis, though it keeps in mind that the evidence of discrimination must be considered as a whole. *Wince*, 66 F.4th at 1040. No matter how the Court cuts it, however, its conclusion is the same: whatever CTU's errors in handling

8

her grievances, Plaintiff has not presented evidence from which a reasonable jury could find discrimination.

The Court begins with the first two grievances regarding bilingual education and support for Plaintiff and maintenance and cleanliness issues. CTU filed both, but argues it did not arbitrate either due to nondiscriminatory reasons. Specifically, CTU explains that arbitrating grievances can cost over $10,000, and so it must focus its resources on grievances "likely to succeed" and which "a favorable ruling from an arbitrator [is] likely to bring significant practical benefits." Doc. 261 at 179. CTU asserts there was no contractual basis for the first grievance, and that when time came to consider whether to arbitrate it, the Board and CTU had signed a renewed collective bargaining agreement containing new protections for bilingual education. Doc. 282 ¶ 13–14. As such, successful arbitration of Plaintiff's first grievance was less likely. For both grievances, CTU also attests that since no other Mireles teachers had made similar complaints, it would have been too difficult for CTU to prevail in arbitration once Plaintiff left Mireles. *Id.*; *see also* Doc. 261 at 178.

Plaintiff's account of the facts is quite different. In her opposition, she describes how Mireles forced her, the school's sole Hispanic teacher, to teach in dangerously unclean conditions and suggests that the rat feces in her classroom were either placed there or deliberately disregarded in retaliation for her speaking up about Mireles' failure to support Spanish-speaking students and educators. *See* Doc. 283 at 6. Accordingly, she argues that a reasonable jury could take from the undisputed fact that she was Mireles' only complaining teacher as reason for CTU to further pursue, rather than drop, her grievances.

While Plaintiff's account is horrific, it is not supported by the record. She describes herself as Mireles's only Hispanic teacher but does not include that fact in her statement of facts

or submit evidence of the race, ethnicity, or national origin of the school's other teachers. And though she hints that the reasons she was "forced" to teach in unclean conditions was that she was Hispanic, *see* Doc. 283 at 6, Plaintiff also fails to substantiate this claim. Similarly, she supplies no evidence in support of her "targeting" theory, *i.e.*, that the rat feces in her classroom were either disregarded or placed in her classroom deliberately.[5]

To survive a summary judgment motion, a nonmoving party must come forward with specific facts demonstrating the existence of a genuine issue for trial. *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). Those facts must include citations to materials in the record. FED. R. CIV. P. 56(c). Plaintiff has done nothing more than speculate. That said, even if Plaintiff had submitted evidence that her poor working conditions at Mireles were because she was Hispanic, this does not prove that she was discriminated against by CTU. For example, Plaintiff does not assert that CTU targeted her with rat droppings or that CTU controlled the physical work conditions at Mireles. There is simply no evidence (direct, indirect, circumstantial, or otherwise) that CTU's treatment of Plaintiff had anything to do with her race or that anyone else of a different race was treated better by CTU.

Plaintiff does identify weaknesses in CTU's explanations for why it did not arbitrate her first two grievances. For instance, CTU asserts it declined to arbitrate Plaintiff's first grievance in part because there was no contractual basis to do so, but Plaintiff points out that CTU cited policy documents when it filed the grievance in the first place. *See* Doc. 261 at 1024 (identifying

---

[5] The Court recognizes that two summary judgment motions are pending, and so also looked for evidence of Plaintiff's account in the statements of material fact submitted by Plaintiff in connection with the Board's separate motion for summary judgment. *See* Doc. 273 (Plaintiff's response to Board's statement of material facts); Doc. 275 (Plaintiff's additional material facts in opposition to Board' summary judgment motion). No such evidence appears.

violations of CPS Policy 603.1 and the Mireles Continuous Improvement Work Plan). CTU also claims it did not pursue Plaintiff's grievance in part because she had left Mireles, but the Court does not see why Plaintiff's employment at a different CPS school would render her unable to supply relevant evidence in arbitration. Moreover, based on the contents of the first grievance, the Court imagines some of the relief demanded—such as compensation for time Plaintiff spent on prep work resulting from excessive workload, *see id*. at 1025—would not have been mooted by her departure from Mireles or the enactment of new provisions to support bilingual education across the CPS school system.

However, even if a reasonable jury could find that CTU mishandled her first two grievances, Plaintiff must do more to save her Title VII claim from summary judgment. What matters is whether CTU's actions were the result of discrimination, not simply whether CTU misjudged the merits of the grievances. On this front, Plaintiff comes up short: she offers no evidence about how CTU arbitrates grievances, generally, let alone that grievances submitted by non-Hispanic teachers are viewed more favorably. Nor has she offered any other evidence of a possible discriminatory motive, such as race-based remarks by CTU, that could raise a genuine dispute as to whether or not CTU's decision not to arbitrate her two grievances was discriminatory.

Next up is Plaintiff's assertion that CTU discriminated against her in how it handled her third and fourth requests to file grievances, which related to her non-renewal at Mireles and her investigation and ultimate departure from Calmeca. CTU admits it never filed either of these grievances, *see* Doc. 282 ¶¶ 10, 21, but argues it had nondiscriminatory reasons for its decision, and that in any event, Plaintiff's claims arising out of these two grievances are time-barred because she did not file an EEOC charge of discrimination within three hundred days of the

11

alleged wrongful conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (Title VII claims time-barred where plaintiff does not first present her claims to the EEOC within three hundred days of wrongful conduct).[6]

The issues and arguments raised in the parties' briefing are numerous, but to resolve the present summary judgment motion, the Court must address only one: Though Plaintiff questions the credibility of the nondiscriminatory reasons offered by CTU for why it did not pursue her third and fourth grievances, she once again fails to provide any facts to suggest any mishandling of those grievances was based on her race or national origin. For example, the parties have agreed both that CTU did not grieve any non-renewals until after ratings were finalized, and that Plaintiff was encouraged to reach back out to CTU after her rating was finalized and did not do so. There is simply no reasonable inference that can be drawn that CTU's failure to grieve Plaintiff's non-renewal was based on her race or national origin under these facts. As such, even if the Court accepted Plaintiff's argument that her claims were not time-barred and that CTU erred in not pursuing her third and fourth grievances, she has still failed to do what a Title VII plaintiff must at summary judgment, which is to link her protected status with CTU's actions into a factually-grounded story of discrimination.

Taking stock of all the evidence, the Court concludes that Plaintiff has not carried her burden of putting forth facts that demonstrate a genuine issue for trial on Plaintiff's Title VII claim against CTU.

_____

[6] Even if a Title VII claim arising from a discrete act of discrimination is time-barred, nothing prevents a plaintiff "from using the [time-barred] acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Thus, the Court may consider facts surrounding the Defendant's handling of Plaintiff's third and fourth grievances, even if time-barred, to the extent those facts support the inference that Defendant discriminated against Plaintiff in its alleged mishandling of her first two grievances.

**CONCLUSION**

For the foregoing reasons, CTU's motion for summary judgment is granted and judgment is entered in CTU's favor.

Dated: September 12, 2025

_____
APRIL M. PERRY
United States District Judge