**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IRMA ROSAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-2778 |
| v. | ) | |
| | ) | Judge April M. Perry |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO, and CHICAGO TEACHERS | ) | |
| UNION LOCAL 1, *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Irma Rosas ("Plaintiff"), a teacher formerly employed by the Chicago Public Schools

("CPS"), brings this discrimination and retaliation case against the Board of Education of the

City of Chicago ("Board"), Evelyn Randle-Robbins, and her former union, the Chicago Teachers

Union Local 1 ("CTU").[1] Relevant here are Plaintiff's claims against the Board and Randle-

Robbins, which are that Plaintiff was discriminated against her based upon her race, ethnicity,

and national origin and suffered retaliation. The Board and Randle-Robbins (collectively,

"Defendants") move for summary judgment on all claims against them. For the reasons set forth

below, Defendants' motion is granted.

### FACTS AT SUMMARY JUDGMENT

The Court uses Plaintiff's and Defendants' Local Rule 56.1 statements to recount the

facts, which are undisputed except where noted. The Court views the facts in the light most

---

[1] The Court entered summary judgment in CTU's favor in a separate opinion and order. *See* Doc. 302.

favorable to Plaintiff, "giving her the benefit of conflicts in the evidence and reasonable inferences from the evidence." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924–25 (7th Cir. 2020).

Plaintiff is Hispanic and of Mexican national origin. Doc. 273 ¶ 1. She was formerly employed as a bilingual teacher by the Board, a municipal body organized to maintain the Chicago Public Schools ("CPS"). *Id*. ¶ 2. Plaintiff's claims against the Board and Randle-Robbins arise from her time teaching at two schools in the CPS system: Arnold Mireles Academy ("Mireles") and Calmeca Academy of Fine Arts ("Calmeca"). *Id*. ¶¶ 7, 39. Plaintiff was not tenured during her two years of employment with CPS. *Id*. ¶ 40.

In June 2018, Plaintiff was hired as a bilingual kindergarten teacher at Mireles. *Id*. ¶¶ 7, 9. In September, Plaintiff began complaining to Principal Randle-Robbins about a lack of teaching materials, nonfunctioning technology, and unsanitary working conditions. *Id*. ¶¶ 12, 15, 17. The Board made efforts to remedy these issues, though the parties dispute vigorously the extent and success of these efforts. *See id*. ¶¶ 10–18; Doc. 294 ¶ 9–10. Around the same time, issues arose regarding Plaintiff's performance as a teacher. On September 12, 2018, after observing Plaintiff in her classroom, Randle-Robbins expressed to Plaintiff her concern about Plaintiff's classroom management and lack of lesson plan, and asked Plaintiff to submit lesson plans in English rather than just Spanish. Doc. 273 ¶ 21.

On September 16, 2018, Plaintiff emailed then-Secretary of the U.S. Department of Education Betsy DeVos, copying several Board officials, and complained that Mireles and CPS had failed to provide adequate education to Spanish-speaking students and lacked an adequate Special Education Program, and that Randle-Robbins required Plaintiff to teach in a manner that

2

violated the legal and policy requirements of bilingual teaching and had repeatedly harassed Plaintiff. *Id*. ¶ 60. Randle-Robbins was not a recipient of the email. *Id*. ¶ 61.

Plaintiff's performance issues continued after the email. In the months following, Plaintiff was informed multiple times by Assistant Principal Stacy Gray that Plaintiff had failed to submit assessment schedules and lesson plans, or that submitted plans did not align with the school's literacy program. *Id*. ¶ 22–23, 25–26. Plaintiff also failed to submit grades correctly or sometimes at all, complete required training, and prepare sufficient emergency lesson plans in the event of her absence. *Id*. ¶¶ 28, 32–34. During this period, Plaintiff was also observed, with feedback provided, on September 20, 2018 and October 16, 2018. *Id*. ¶¶ 24, 29.

Starting in November, Plaintiff began receiving a heightened form of discipline. On two separate occasions in November, Randle-Robbins sent Plaintiff pre-meeting notices regarding Plaintiff's failure to perform her teaching duties. These notices identified Plaintiff's failure to attend parent-teacher conferences and submit student learning tasks, assessments, or lesson plans as directed, and were followed in December 2018 by a performance improvement plan. Doc. 273 ¶¶ 30–31. In January 2019, Plaintiff was sent two more notices for failing to complete learning tasks and for leaving work early without administrative approval. *Id*. ¶¶ 35–36. Plaintiff disputes that her absence was unapproved. *Id*. Plaintiff was formally observed and evaluated on January 10, 2019, and scored unsatisfactory in both professional practice and performance tasks. *Id*. ¶ 37. Plaintiff then went on voluntary leave from at least February 4, 2019 to May 6, 2019. Doc. 265-42 at 2.

On May 31, 2019, Plaintiff was informed that she would not be renewed to teach at Mireles a second year. The Board asserts that Plaintiff's unsatisfactory performance was the

reason for her non-renewal. *See id.* ¶¶ 37–38. Plaintiff argues that her non-renewal was not administratively proper, a factual dispute the Court will address below.

Plaintiff continued working at CPS after her Mireles non-renewal. On August 15, 2019, Plaintiff was hired as a probationary appointed teacher at Calmeca, where Sylvia Orozco-Garcia served as principal.[2] Doc. 273 ¶ 39. Issues arose again. In November 2019, a parent of one of Plaintiff's students complained that Plaintiff had pulled the student's ear and touched their thigh, leading to the student's removal from Plaintiff's classroom. Doc. 273 ¶ 45. Orozco-Garcia reported this incident to the Department of Children and Family Services, which triggered an internal review by CPS's Law Department. Doc. 294 ¶¶ 25–27. Later in November, another Calmeca parent requested that her child be removed from Plaintiff's classroom due to how often Plaintiff yelled. Doc. 273 ¶ 46. And in early December 2019, after a parent confronted Plaintiff about taking a ruler away from a student, Plaintiff refused to work with the parent and ultimately asked for the child to be removed from her classroom. *Id.* ¶ 47. At times, Plaintiff would refuse to discuss these incidents or her teaching performance with Orozco-Garcia. *Id.* ¶ 49.

On January 2, 2020, Plaintiff took another voluntary leave of absence. *See* Doc. 265-33 at 107. The Board approved Plaintiff's leave for a period of January 2, 2020 until March 1, 2020, but informed Plaintiff that it would "not be able to offer any position protection with this absence." Doc. 273 ¶¶ 44, 52–53; *see also* Doc. 265-44 at 1. Plaintiff admits that due to her 2019 leave of absence she was ineligible for job-protected leave under the Family and Medical Leave Act. Doc. 273 ¶ 52–53. While on leave, the Board hired a teacher to carry out Plaintiff's teaching duties. Doc. 273 ¶¶ 55–56.

---

[2] Plaintiff's operative complaint brought claims against Orozco-Garcia but none of those claims remain pending. *See* Doc. 205.

Plaintiff's discretionary leave expired on March 1, 2020. Doc. 273 ¶ 58. The Board asserts that Plaintiff did not return to work after her leave expired or submit the required paperwork to request a leave extension. Doc. 273 ¶ 58. On April 29, 2020, the Board sent a letter to Plaintiff stating that her "approved discretionary leave ha[d] ended as of 3/2/20" and that her "employment [was] being separated as of the date of this letter." Doc. 273 ¶ 59; *see also* Doc. 265-33 at 25. Plaintiff disputes the context surrounding her termination. *See id* ¶¶ 57–58.

On February 18, 2021, the Board held an investigatory conference on the misconduct allegations against Plaintiff, which Plaintiff attended. Doc. 273 ¶ 63. At the conference, Plaintiff refused to be sworn in or to testify. Doc. 273 ¶ 64; *see also* Doc. 265-34 at 40–41. On March 24, 2021, Plaintiff's separation was converted to a termination for cause. Doc. 273 ¶ 65.

## LEGAL STANDARD

Summary judgment is proper when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmovant then must come forward with specific facts showing there is a genuine issue for trial. *See LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in her favor, this obligation does

not extend to drawing inferences that are supported by only speculation or conjecture. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## ANALYSIS

At issue in this motion are Plaintiff's claims against the Board and Randle-Robbins. These include Plaintiff's Title VI claim against the Board (Count I); Title VII discrimination claim against the Board (Count II); Title VII retaliation claim against the Board (Count III); and equal protection claim under 42 U.S.C. § 1983 against Randle-Robbins (Count V). Each claim will be addressed separately.

### I.     Title VII Discrimination – Count II

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a Title VII disparate treatment claim, "a plaintiff must allege that an employer took job-related action against [her] which was motivated by intentional discrimination." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). At summary judgment, Title VII plaintiffs may organize their evidence of discrimination into the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or instead present evidence "in a holistic fashion, by proffering direct or circumstantial evidence of intentional racial discrimination." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023). Under the *McDonnell Douglas* framework, the plaintiff has "the initial burden to establish a *prima facie* case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022). The

elements of a prima facie case are that (1) plaintiff is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Id*. But no specific approach to marshalling evidence is required so long as a reasonable factfinder could take the evidence as a whole and "conclude that it added up to race discrimination." *Wince*, 66 F.4th at 1041; *see also Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (plaintiffs need not follow *McDonnell Douglas* framework to prove discrimination but do need to show that the relevant evidence could support a finding of injury "*because of*" a protected characteristic).

Here, Plaintiff identifies three adverse employment actions that she attributes to the Board's discrimination: her layoff from Mireles, her termination from Calmeca, and her later placement on a "do not hire" list maintained by the Board. Doc. 166. In response, Defendants argue that all of those employment actions were due to Plaintiff's job performance. When an employer argues it terminated an employee due to poor performance, the burden-shifting framework of *McDonnell Douglas* and holistic approach collapse into one. *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025). This is because in such cases, "issues of satisfactory performance and pretext overlap, allowing [courts] to proceed directly to … pretext." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). Here, the Board has offered nondiscriminatory explanations for each employment action it took against Plaintiff, and so the only question for the Court is "whether there is sufficient evidence for a reasonable jury to conclude that the explanation is pretext for illegal discrimination or retaliation." *Upchurch v. Indiana*, 146 F.4th 579, 587 (7th Cir. 2025).

Pretext is defined as a "dishonest explanation, a lie rather than an oddity or an error." *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024). Even if an employer's reason

for some employment decision is "inaccurate, unfair … foolish, trivial, or baseless," the reason is still not pretext if "honestly believed." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023). Proving pretext requires a Title VII plaintiff to "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025) (internal citation omitted). A plaintiff bears the burden of proving her employer's stated reasons were false. *Cunningham v. Austin*, 125 F.4th 783, 790 (7th Cir. 2025).

The Court turns first to Plaintiff's non-renewal at Mireles. Plaintiff admits that Randle-Robbins and Assistant Principal Gray identified performance issues across repeated observations of Plaintiff's classroom, and that Plaintiff was issued multiple notices for failure to perform various duties as a teacher. Doc. 273 ¶¶ 30–31, 35. These shortfalls included Plaintiff's failure to provide or follow lesson plans, submit accurate grades and student assessments, and attend parent-teacher conferences. *Id*. ¶¶ 21–22, 25–26, 30–33. While Plaintiff proposes a different framing or context for some of these critiques, Plaintiff does not challenge the underlying facts.

Nonetheless, Plaintiff challenges the Board's performance-based explanation for terminating her from Mireles. The factual basis for Plaintiff's challenge is her assertion that she "received only one of three required observations." Doc. 294 ¶¶ 14–15. Without three formal observations, Plaintiff contends that CPS's Educator Evaluation Handbook requires a probationary teacher like Plaintiff to "have defaulted to a rating of 'proficient.'" *Id*. If she had received a proficient rating, Plaintiff argues she would not have been eligible to be terminated.

The Court finds that Plaintiff has not met her burden of demonstrating that the Board deviated from its policy by not rating her as proficient. The 2018–2019 Educator Evaluation Summary Report on which Plaintiff relies shows she received only one formal evaluation (on

January 10, 2019) and was not rated. *See* Doc. 265-13 at 2. That said, the Educator Evaluation

Summary Report also states that no rating is calculated when "an annually rated educator works

less than 150 days in a school year." Doc. 265-13 at 2. Plaintiff took leave from at least February

4, 2019 to May 6, 2019, and appears to have last been at work on January 18. Doc. 265-42 at 2;

Doc. 265-4 at 40. Given that Plaintiff has not presented evidence about how many days she

worked in the 2018–2019 school year, the question thus becomes whether it is a reasonable

inference that Plaintiff worked at least 150 days during a school year in which she took leave for

more than four months. The Court does not believe that it is. Neither party has put evidence into

the record about when the school year begins and ends, but the Court considers this to be

common sense.[3] Utilizing that common sense, it would be mathematically impossible for

Plaintiff to have worked for 150 days of the school year when she was absent from at least

January 18 through May 22.[4] It is Plaintiff's burden to show that she was entitled to a proficient

rating. On this record, Plaintiff has not met that burden.

      Even if Plaintiff had met her burden of showing that she technically was required to

default to a "proficient" rating because she did not receive the correct number of formal

evaluations, the Court does not believe this would allow Plaintiff to survive summary judgment

on this record. An "employer's divergence from its standard [employment] practices can

---

[3] It is common knowledge that public school does not begin before mid-August, or end past mid-June. Moreover, anyone who has resided in or around Chicago knows that the Bud Billiken Day Parade, held in mid-August, marks the end of the summer for CPS students. The 100th day of school has become a celebration for Illinois grade schoolers that approaches that of any other holiday of great import. Children and parents alike know that the 100th day of school falls between mid-January and mid-February.

[4] The record shows that Plaintiff had other absences besides just January 18 – May 22. *See, e.g.,* Doc. 265-26 at 2 (referencing three days of absences in December 2018); Doc. 265-34 at 24–25 (referencing Plaintiff being absent November 2–14, 2018). Thus, even if Plaintiff worked every non-holiday and non-weekend day between her hire date of June 4, 2018 and January 18, 2019, she would not have worked 150 total days.

9

establish, or at least be evidence of, pretext and defeat summary judgment." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 717 (7th Cir. 2023). For a policy deviation to be probative of discrimination, courts typically look for some evidence linking the policy departure to a discriminatory motive, such as proof that "an employer has applied its policies differently between protected-class and non-protected-class members." *Id.* (collecting cases on selective policy enforcement); *see also Cunningham v. Austin*, 125 F.4th 783, 791 (7th Cir. 2023) (deviation from policy not probative of discrimination without evidence linking deviation to plaintiff's protected status).

Here, there is no evidence that any policy deviation was motivated by discrimination. Plaintiff relies entirely on Randle-Robbins's testimony and the Evaluation Handbook to reach the conclusion that Plaintiff had to be retained—despite documented performance problems—if Plaintiff had received a proficient rating. But the Court does not believe either can be read so broadly. Randle-Robbins professed a lack of understanding about the rating system, and indicated that this was something the "talent office" at CPS was responsible for handling. Doc. 265-4 at 39. Randle-Robbins received a document from that office which showed Plaintiff had less than a 5% chance of being rated proficient, which made Plaintiff eligible for non-renewal. *Id.*[5] To the extent this was an error, there is no evidence that Randle-Robbins was responsible for that error. *Id.* Nor is there any evidence that any error was based upon Plaintiff's race or national origin or that CPS "applied its policies differently between protected-class and non-protected-class members." *Barnes-Staples*, 88 F.4th at 717. For example, Plaintiff submits no evidence to suggest that similarly situated teachers not of her protected status (that is, probationary teachers

---

[5] The Handbook upon which Plaintiff relies indicates that principals may non-renew based upon projected ratings. Doc. 291-1 at 67.

with poor performance who did not receive three formal observations) were renewed. Instead, she builds her discrimination case—as she is entitled to do—on more general evidence about her time at Mireles, namely (1) anecdotes regarding Principal Randle-Robbins's leadership; and (2) the lack of support and resources she received as a teacher at Mireles.

Much of Plaintiff's argument for discrimination focuses on ways that African American causes were championed when Mexican American ones were not. For example, Plaintiff testified that she once asked Randle-Robbins for permission to take her current and former bilingual students to the Mexican American Art Museum, but was refused on grounds that Plaintiff would need include the entire grade level of students on the trip. Doc. 294 ¶ 6. Plaintiff compares this refusal to Randle-Robbins scheduling a field trip to UniverSoul, an "African American circus." Doc. 294 ¶ 7. Plaintiff notes further that "on one occasion," Randle-Robbins directed teachers to teach on the life of Martin Luther King Jr. and "on another occasion" to "create two lesson plans on African American studies." Doc. 265-33 at 48. According to Plaintiff, Randle-Robbins "never made the same teaching requirements or directives with respect to Mexican American students." Doc. 294 ¶ 7. Plaintiff argues that a jury could reasonably infer from this evidence that Randle-Robbins harbored animus towards Hispanic or Mexican students or teachers, and furthermore that the decision not to renew Plaintiff for another year at Mireles was tainted by Randle-Robbins's involvement in that process. *See* Doc. 290 at 17.

The Court is not persuaded that this evidence supports a discrimination finding. By Plaintiff's own account, Randle-Robbins supplied a neutral reason for her rejection of Plaintiff's field trip request, *i.e.*, that field trips needed to include the entire grade level. Plaintiff fails to meaningfully contrast this rebuff to the UniverSoul field trip because she offers no evidence suggesting the UniverSoul field trip included less than the entire grade level, nor any evidence

that Randle-Robbins permitted any other field trips that included subsets of a grade level. Absent additional context or facts to sustain the comparison, no jury could reasonably conclude that Randle-Robbins' actual reason for denying Plaintiff's request was animus towards Hispanic or Mexican teachers or students.

Nor could a jury reasonably infer anti-Hispanic, anti-Mexican animus from the fact that Randle-Robbins never asked teachers to teach Mexican American studies but once requested teachers to teach about Martin Luther King Jr. and twice asked teachers to create lesson plans on African American studies. Plaintiff's argument seems to be that when a person (here, Randle-Robbins) expresses support for curriculum with some nexus to one demographic group's history or experiences, that support may be relied on as affirmative evidence of animus toward another group. Absent further evidence to support Plaintiff's meager view of human capacity, the Court will not entertain such speculative inferences.

With that, the Court comes last to Plaintiff's assertion that while a bilingual teacher at Mireles, the Board did not provide Plaintiff with adequate teaching materials, support, or mentorship. Doc. 294 ¶¶ 9–10. The Board heavily disputes this as a factual matter, but at summary judgment, the Court accepts Plaintiff's account of the facts. Again, however, Plaintiff falls short because she supplies no evidence to suggest any such deprivations were motivated by discrimination. There are no explicit or ambiguous statements of animus, nor any evidence that non-Hispanic, non-Mexican teachers at Mireles or elsewhere in CPS received resources or mentorship that Plaintiff was denied. Perhaps Plaintiff's concern is that because the Board employed her as a bilingual teacher, any lack of support for *her* would logically result in worse educational outcomes for her Spanish-speaking students. A legitimate concern, certainly, but still not evidence of discrimination. Because there is no evidence a jury could reasonably rely on to

12

find that a non-Hispanic, non-Mexican in Plaintiff's position would have received more institutional support from the Board than Plaintiff did, her story of inadequate teaching material, support, or mentorship does not help her discrimination claim.

The Court recognizes that it must review evidence of discrimination holistically, insofar as a believable story of discrimination might emerge from a collective whole, even if it would not from its isolated, constituent parts. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). But even taking every shred of alleged discrimination provided by Plaintiff, the gaps are simply too large for inference to reasonably bridge. To the extent she relies on her time at Mireles to make her Title VII claim, Plaintiff has not carried her burden of presenting evidence from which a reasonable jury could find the Board did not renew her based on her protected status, rather than based upon her consistent performance issues.

The Court next turns to Plaintiff's Calmeca termination. Defendants argue that the Court should not consider this evidence at all, because Plaintiff failed to exhaust her remedies with the EEOC. To bring a Title VII discrimination claim, a plaintiff must first exhaust her administrative remedies by filing a charge with the EEOC "within 180 or 300 days after the alleged unlawful employment practice occurred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). The filing deadline in Illinois is 300 days. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). Furthermore, a plaintiff may bring in her federal suit "only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (internal quotes omitted). Claims are reasonably related where "(1) there is a reasonable relationship between the allegations in the charge and the claims in the complaint and (2) the claim in the complaint can be reasonably expected to grow out of the allegations in the

13

charge." *Id.* (internal quotes omitted). To satisfy the second prong, the Court considers "what the EEOC might or might not discover in the course of an investigation" based on the "scope of the EEOC complaint and other written allegations." *McHale v. McDonough*, 41 F.4th 866, 870 (7th Cir. 2022). "The fact that the charge and complaint generally assert the same kind of discrimination is not sufficient, without some factual relationship between them." *Chaidez*, 937 F.3d at 1005.

Plaintiff filed two discrimination charges with the EEOC. The first was filed on December 14, 2018, *see* Doc. 273 ¶ 68, and complained about Plaintiff having been "assigned to a classroom [at Mireles] with deplorable conditions," being "subjected to harassment and discipline" after complaining about the quality of bilingual education, and otherwise being "discriminated against because of [her] national origin, Mexican." Doc. 166-2 at 2. The second EEOC charge was filed on September 8, 2021 and asserted discrimination claims based on Plaintiff's Calmeca layoff and the Board's misconduct investigation, which resulted in Plaintiff's placement on a do-not-hire list. Doc. 273 ¶ 70; *see also* Doc 166-4 at 1–2.

Plaintiff's claims based on her Calmeca layoff are time-barred. Plaintiff does not dispute that she received her notice of separation from Calmeca on April 29, 2020 but did not submit her EEOC charge until September 8, 2021, which is more than 300 days later. Nor is there any argument that Plaintiff's Calmeca-related claims reasonably grow out of her December 2018 charge, as the charge and her Calmeca-related claims do not "describe the *same conduct* and implicate the *same individuals*." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994) (emphasis in original). To the contrary, Plaintiff's Mireles claims involve a different school, different principal, and wholly different types of both alleged discrimination by her supervisors and alleged performance deficiencies by Plaintiff than occurred at Calmeca. It would not be

possible for the EEOC to have discovered through its investigation of Plaintiff's earlier charge that roughly a year later and while working at a different school, Plaintiff would be subject to allegations of misconduct by her students' parents, which then caused Plaintiff to take a leave that resulted in her termination. Plaintiff therefore cannot rely on her December 2018 EEOC complaint to demonstrate that her current Calmeca claims are timely.

Plaintiff argues she should not be required to file an EEOC charge because at the time of her Calmeca dismissal, she was already engaged in active litigation against Defendant. Plaintiff bemoans that such a requirement would force complainants who continue to suffer discrimination to file serial EEOC charges. However, that concern is ameliorated by the Seventh Circuit's instruction that new EEOC claims are not required for continuing discrimination "reasonably expected to grow out of the allegations in the charge." *Chaidez*, 937 F.3d at 1005 (internal citations omitted). But here, Plaintiff offers no evidence that the Calmeca claims represented continuing discrimination. Therefore, Plaintiff's Calmeca-related claims are time-barred.[6]

Finally, the Court addresses the culmination of the Board's misconduct investigation, which was its March 2021 decision to convert Plaintiff's separation from Calmeca to a

---

[6] Suffice it to say, even if Plaintiff's Calmeca-related claims were not time-barred, there is no evidence that Plaintiff was terminated because she was Hispanic or of Mexican origin. Plaintiff acknowledges that while she was on leave the Board had the right to hire another teacher to fill Plaintiff's position. Unlike at Mireles, Plaintiff submits no evidence that Principal Orozco-Garcia had any problems with Hispanic or Mexican teachers, or that Plaintiff had any disputes with Orozco-Garcia about bilingual education, facilities maintenance, or receiving proper educational support. Rather, Plaintiff's problems at Calmeca stemmed from the fact that three different parents complained about Plaintiff within the first four months of the school year and Plaintiff then promptly took three months of unprotected leave. Thus, even if the Court were to consider the Calmeca evidence coupled with the Mireles evidence to determine if the evidence together supported a discrimination claim, the Court would conclude it does not.

termination for cause.[7] Although neither party has briefed it, the Court assumes for the purposes of this motion both that the Board's conversion of Plaintiff's termination to one for cause represents its own actionable adverse employment action and that Plaintiff's complaint about it is timely. Neither party submits much argument on this theory separate from Plaintiff's Calmeca termination, but again, Plaintiff has offered no evidence to support the inference that the individuals involved in Plaintiff's investigation were motivated by consideration of Plaintiff's race, ethnicity, or national origin. Though Plaintiff points to perceived investigatory oddities, such as the crediting of hearsay or the method by which the evidence was collected, Plaintiff supplies no facts from which one could infer that the Board deviated from its standard investigatory procedure or that teachers not of Plaintiff's protected status received the benefits of a more (or perhaps less) rigorous investigation when facing similar allegations. Finding no evidence of any discriminatory motive driving the investigation, this theory of discrimination cannot stand.

In summary, and viewing the evidence taken together, the Court finds a reasonable jury could not find that Plaintiff's non-renewal at Mireles or termination for cause from Calmeca were motivated by discrimination. Summary judgment in favor of the Board is therefore proper on Plaintiff's Title VII discrimination claim.

## II.    Title VII Retaliation – Count III

Plaintiff also brings a Title VII retaliation claim against the Board. "Title VII prohibits employers from retaliating against employees for complaining about discrimination." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019), citing 42 U.S.C. § 2000e-3(a). To survive

---

[7] In the complaint, Plaintiff alleges that this resulted in Plaintiff being placed on a "do not hire" list, although neither party supports such an assertion with evidence in the record.

16

summary judgment on her Title VII retaliation claim, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) the Board took materially adverse employment action against her; and (3) a causal link exists between the two. *Id*. To show causal link in a Title VII retaliation case, plaintiffs must show but-for causation. *Univ. of Texas Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 362 (2013). That is, there must be evidence that "the adverse action would not have happened" had she not engaged in her protected activity. *Adebiyi v. S. Suburban College*, 98 F.4th 886, 892 (7th Cir. 2024). Causation evidence may be direct or circumstantial, with circumstantial evidence encompassing "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). All evidence, whether direct or circumstantial, is considered together, not separately. *Ortiz v. Werner Enters.*, 834 F.3d 760, 766 (7th Cir. 2016).

In this case, there are two protected activities that Plaintiff engaged in prior to any adverse employment actions at Mireles or Calmeca: first, Plaintiff's September 2018 email sent to then-Secretary DeVos, and second, Plaintiff's EEOC complaint in December 2018. *See* Doc. 206 at 12.[8] The Board makes multiple arguments for why Plaintiff's retaliation claim fails either due to lack of adverse action or causal link, which for ease of analysis, the Court separates into evidence involving Mireles and evidence involving Calmeca.

Regarding Mireles, the Board makes two arguments: first, that Plaintiff cannot establish that Randle-Robbins was aware of Plaintiff's protected activity, and that there is therefore no

---

[8] The Court notes that Plaintiff has never included her December 2018 EEOC charge as a basis for retaliation in her complaint, despite the Court having encouraged her to do so. Doc. 206 at 10 n.4. For the sake of completeness, the Court will address it here as though it had been properly pled.

causal link between Plaintiff's protected activity and any adverse actions; and second, that the scrutiny and discipline Plaintiff faced at Mireles do not rise to the level of adverse employment actions.

To demonstrate a causal link between a protected activity and an adverse employment action, "the superior must have had knowledge of that protected activity." *Tyburski v. City of Chicago*, 964 F.3d 590, 603 (7th Cir. 2020); *see also Vassileva v. City of Chicago*, 118 F.4th 869, 875 (7th Cir. 2024).[9] It is undisputed that some Board officials knew of Plaintiff's email to Secretary DeVos. Doc. 273 ¶ 60. But given that Randle-Robbins was the sole identified decision-maker for Plaintiff's termination, it is only her awareness of the September 2018 email to DeVos and certain Board officials that is relevant. *See Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 513 (7th Cir. 2021) (relevant inquiry at summary judgment is whether the specific individuals empowered to carry out the adverse act were aware of plaintiff's protected activity).

It is undisputed that Randle-Robbins was not one of the email's original recipients. Doc. 273 ¶ 61. Moreover, Randle-Robbins's sworn testimony is that while aware of the fact that Plaintiff sent an email received by the Chief of Schools, Randle-Robbins had no knowledge of its details or substance, up to and including the fact that it contained a critique of her or Mireles or that it was sent to the U.S. Department of Education. *Id.*; *see also* Doc. 265-4 at 8–9. That is, Randle-Robbins's testimony, if believed, is that she had no awareness that Plaintiff had engaged

---

[9] The Board miscites *Luckie v. Ameritech Corp.*, 389 F.3d 708 (7th Cir. 2004) for the supposed principle that general knowledge of a complaint is insufficient to support the causal connection element of a retaliation claim. This misstates the holding: the distinction drawn in *Luckie* is not between specific and general awareness, but actual versus hypothetical awareness. *See id.* at 715 ("It is not sufficient that Patterson *could* or even *should* have known about Luckie's complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory.").

in any sort of protected activity.[10] Plaintiff argues a jury might disbelieve Randle-Robbins's testimony, but offers no actual evidence to the contrary and the argument that a jury might disbelieve a deponent's sworn testimony, without more, does not create a genuine factual dispute. *See*, *e.g.*, *Estate of Logan v. City of South Bend, Ind.*, 50 F.4th 614, 615 (7th Cir. 2022) (collecting cases). And Plaintiff provides no evidence at all the Randle-Robbins knew about Plaintiff's December 2018 EEOC charge. Accordingly, Plaintiff has failed to raise a genuine issue of fact in support of causation for her Mireles-based retaliation claim. As such, the Court need not reach the Board's argument that Plaintiff's work conditions at Mireles did not constitute a retaliatory hostile environment.[11]

Turning to Plaintiff's Calmeca layoff and the subsequent misconduct investigation, Plaintiff's retaliation claim again fails due to the lack of a causal link between any adverse employment actions and Plaintiff's protected activity. Plaintiff's first problem is that her September 2018 email to Secretary DeVos and December 2018 EEOC charge preceded any adverse action at Calmeca by at least fifteen months. *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) (noting that an "inference of retaliation can be weakened by a lengthy period of time between the protected activity and the alleged retaliation."). Even periods as short as six months may be too long to infer a causal link. *See*, *e.g.*, *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010). But this is not a "bright-line rule," as the question is always "whether, in light of all

---

[10] Plaintiff filed her original complaint against the Board on April 25, 2019, alleging retaliatory harassment and discipline. Doc. 1 at 5. The complaint did not attach or otherwise refer to Plaintiff's September 2018 email to Secretary DeVos. *Id.* Moreover, Randle-Robbins did not appear as an individual defendant in this matter until Plaintiff's first amended complaint, which was filed July 30, 2019, after Plaintiff had been non-renewed. Doc. 17. Thus, the record does not support the inference this litigation made Randle-Robbins aware of by Plaintiff's protected activity prior to Plaintiff's termination.

[11] Plaintiff argues only hostile environment due to retaliation, not discrimination via hostile workplace. *See* Doc. 166 at 6–7.

the circumstances, a reasonable jury could infer retaliatory motive for the adverse action."
*Murphy v. Caterpillar Inc.*, 140 F.4th 900, 919 (7th Cir. 2025). This goes both ways however:
where other record facts suggest "additional breaks in the causal chain," summary judgment on a
retaliation claim may be appropriate. *Id*.

For Plaintiff, the causal chain is broken by her lack of evidence that the decisionmakers
involved in either her Calmeca termination or the misconduct investigation were aware of her
September 2018 email or December 2018 EEOC complaint. Plaintiff identifies a few
decisionmakers involved in her termination and misconduct investigation —Orozco-Garcia, the
CPS Law Department investigator Kelly Tarrant, as well as Matthew Lyons, Mary Erensti, and
Jennifer Reger—but offers no evidence from which a jury could reasonably infer that these
employees knew of Plaintiff's email to then-Secretary DeVos or her EEOC complaint of
discrimination.

Starting with Orozco-Garcia, nothing in either parties' statements of fact suggest Orozco-
Garcia knew about Plaintiff's email or EEOC complaint which preceded Orozco-Garcia working
with Plaintiff. As for Tarrant, the entirety of Plaintiff's evidence seems to be an email Tarrant
received on January 27, 2020 from a Board employee named Marieth Johnson. The email body
contains a table listing five "matters" that Johnson describes as "entries in Lawtrac." Doc. 291-1
at 239. One of these listed entries identifies the charge number, without any additional
information, for the EEOC charge Plaintiff submitted in December 2018. *See id.*; *see also* Doc.
166-2 at 2 (copy of Plaintiff's EEOC charge). However, Tarrant testified that the email did not
include any attached documents, which is consistent with Johnson asking Tarrant in the email
whether Tarrant needs "these downloaded as well." Doc. 291-1 at 165–167, 239. Moreover, even
assuming these listed items were accessible by clicking the link in the email, Tarrant attests that

20

she did not do so and that some were locked and belonged to different departments. Doc. 291-1 at 166–67. And Tarrant further testified that she did not learn of the lawsuit or any EEOC complaint until she received a notice of deposition. *Id.* at 119.

In her opposition, Plaintiff argues that the fact "Ms. Tarrant testified that she was only aware of the lawsuit upon receiving her subpoena to testify at deposition does not mean a jury will believe her." Doc. 290 at 17–18. But again, that a jury might disbelieve a deponent's sworn testimony, without more, does not create a genuine factual dispute. *See*, *e.g.*, *Estate of Logan v. City of South Bend, Ind.*, 50 F.4th 614, 615 (7th Cir. 2022). Plaintiff also suggests awareness might be inferred because Tarrant "supercharged" her investigatory efforts after being "notified of Plaintiff's EEOC charges and lawsuit." Doc. 290 at 17. Plaintiff seems to draw this conclusion from the one-day interval between Tarrant's receipt of Johnson's email on January 27, 2020 and Tarrant's email to Orozco-Garcia on January 28, 2020. Doc. 294 ¶¶ 37–38; Doc. 291-1 at 238. But this argument is too speculative to credit, as Plaintiff declines to submit any evidence about the standard pace or course of an investigation, which would be required for a jury to infer that the timing of this sequence was unusual.

Last, the Court comes to Matthew Lyons, Mary Ernesti, and Jennifer Reger, all of whom were aware of the investigation into Plaintiff's alleged misconduct and seemed to have participated in email conversations regarding what disciplinary measures to impose on Plaintiff. Doc. 294 ¶¶ 42–44. But Plaintiff makes no argument that any of these employees were aware of Plaintiff's September 2018 letter or December 2018 EEOC charge. These were not the only individuals copied on these email threads, however, and so in the interest of comprehensiveness, the Court has taken the initiative of scouring the record for evidence that any Board employees likely to be aware of Plaintiff's email to Secretary DeVos were involved in her Calmeca layoff or

the misconduct investigation. The only three recipients of Plaintiff's September complaint to Secretary DeVos with CPS emails were Janice Jackson, Ernesto Matías, and Shenethe Parks. *See* Doc. 265-50 at 2. None of those individuals appear on any of the investigation-related emails that Plaintiff submitted with her summary judgment briefing. *See* Doc. 291-1 at 227–73. Neither does Plaintiff argue—nor can the Court determine from its own review of the evidence—that any attachments to these emails referenced, much less discussed, either Plaintiff's EEOC charge or the DeVos email. *See id.* Doc. 291-1 at 227–50, 265–73.

In summary, Plaintiff fails to submit evidence that the decisionmakers involved in her termination from Calmeca or misconduct investigation were aware of her September 2018 email to then-Secretary DeVos or her December 2018 EEOC complaint. Thus, she cannot show a causal link between that protected activity and any adverse action during or after Plaintiff's time at Calmeca. Summary judgment is therefore appropriate on Plaintiff's Title VII retaliation claim.

### III. Title VI Discrimination – Count I

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In effect, Title VI "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 286 (1998).

To bring a Title VI private action, a plaintiff "must be the intended beneficiary of, an applicant for, or a participant in a federally funded program.'" *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1235 (7th Cir. 1980). Accordingly, Title VI claims generally do not extend to

employment practices unless "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahern v. Bd. of Educ. of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998).

The only evidence in either party's statement of facts regarding CPS's receipt of federal funds is the Board's statement that "Mireles received CPS' federal Title III funds, which are earmarked to cover any excess cost in providing English Learner (EL)-specific supports and services that enhance and maximize EL programs." Doc. 273 ¶ 8. Neither party offers any detail as to what specific Title III program CPS received funds from or the objective of said program. Since Plaintiff offers no argument or evidence that employment is the primary objective of the Title III funds,[12] the Court proceeds to analyze Plaintiff's evidence (1) that she was the victim of employment discrimination, and (2) if so, whether that discrimination "necessarily cause[d] discrimination against the primary beneficiaries of the federal aid." *Ahern*, 133 F.3d at 978.

The Board suggests, without opposition from Plaintiff, that the Court should apply the same standards when analyzing a Title VI discrimination claim as would be applied to a Title VII discrimination claim. Doc. 267 at 5, citing *Marcial v. Rush Univ. Med. Ctr.*, 2019 WL 3943667, at *6 (N.D. Ill. Aug. 21, 2019). In its foregoing discussion of Plaintiff's Title VII discrimination and retaliation claims as to her time at Mireles, this Court found that Plaintiff's evidence does

---

[12] The Board states that it uses its Title III funds for English Learner Program Teacher stipends and English Learner tutoring, *see* Doc.273 ¶ 8, but even assuming this means employing teachers, the fact that an educational institution puts federal funds towards teacher salaries does not on its own establish that the primary objective of those funds are employment. *See, e.g., Cieslik v. Bd. of Ed. of City of Chicago*, 2021 WL 1172575, at *3 (N.D. Ill. Mar. 29, 2021); *Veljkovic v. Bd. of Ed. of City of Chicago*, 2020 WL 7626735, at *4 (N.D. Ill. Dec. 22, 2020).

not support a reasonable inference of employment discrimination. With evidence of discrimination lacking, summary judgment on the Title VI claim is proper.[13]

This is not to condone what may have happened at Mireles. The Court recognizes that even if Plaintiff failed to show discrimination, there is genuine factual dispute as to whether Plaintiff received the proper teaching materials and mentorship while at Mireles. Nor is it unreasonable to infer that when a teacher lacks adequate resources or support, the educational outcomes of her students will suffer. But not every harm that might befall students gives rise to a Title VI claim for their teachers, just as not every institutional misstep is caused by discrimination. For Plaintiff's Title VI claim to survive summary judgment, she must first show that she suffered an adverse employment action motivated by discriminatory animus. Having failed to do so, summary judgment in favor of the Board is merited as to Plaintiff's Title VI claim.

### IV.   § 1983 Equal Protection – Count V

The last remaining claim is Plaintiff's Section 1983 equal protection claim against Randle-Robbins. "The legal standard for analyzing racial discrimination claims under Title VII and § 1983 is the same." *Barnes v. Bd. Of Trus. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020). That is, the "applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that … discrimination caused the adverse employment action." *Id*. Accordingly, Plaintiff's Section 1983 claim against Randle-Robbins—for failing to supply Plaintiff with adequate resources and ultimately not renewing

---

[13] The Court does not analyze Plaintiff's Title VI claim with respect to her time at Calmeca because none of Plaintiff's complaints about Calmeca in any way touched upon student services or discriminatory treatment of Spanish-speaking children. Nor has Plaintiff supplied any evidence that Calmeca is a recipient of federal funds.

24

Plaintiff's position at Mireles—does not survive summary judgment for the same reasons that Plaintiff's Title VII discrimination claim fails against the Board.[14]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and judgment is entered in favor of the Board and Randle-Robbins.

Dated: September 23, 2025

_____
APRIL M. PERRY
United States District Judge

---

[14] The Court does not credit Defendants' argument that Randle-Robbins was unaware of Plaintiff's Hispanic race or Mexican national origin. Randle-Robbins does not dispute that Plaintiff displayed her Mexican American heritage in her classroom and made a request to bring her students to the Mexican American Art Museum. Doc. 294 ¶¶ 5–6. Moreover, defense counsel was too clever by half by asking Randle-Robbins if she could discern Plaintiff's race "beyond on sight" and then arguing that Randle-Robbins did not know Plaintiff's race. *See* Doc. 265-4 at 41. While national origin might not be visually discernible, a person's race—at least to the extent it may drive the beholder to discriminate—is often "something obvious at a glance" such that ignoring appearance as a valid form of evidence is absurd. *Reed v. Great Lakes Cos.*, 330 F.3d 931, 936 (7th Cir. 2003); *see also Vieth v. Jubelirer*, 541 U.S. 267, 287 (2004).